Mark ISAACS and Margaret Isaacs

v.

**BOARD OF TRUSTEES OF TEMPLE UNIVERSITY — OF the COMMONWEALTH SYSTEM OF HIGHER EDUCATION et al.**

**Civ. A. No. 73–1992.**

United States District Court,
E. D. Pennsylvania.

Nov. 11, 1974.

474

Thomas W. Jennings, Ettinger, Poserina, Silverman, Dubin, Anapol & Sagot, Philadelphia, Pa., for plaintiffs.

Peter Platten, Richard Z. Freemann, Jr,. Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., for defendants.

## OPINION

HIGGINBOTHAM, District Judge.

### INTRODUCTION

Plaintiffs, Mark and Margaret Isaacs, filed this action subsequent to the termination of their employment as faculty members in the School of Communications and Theatre of Temple University —of the Commonwealth System of Higher Education (hereinafter "Temple"). In their complaint, they invoked the jurisdiction of this Court pursuant to 28 U. S.C. § 1343(3) and (4) (1970) and specified provisions of the Civil Rights Act of 1871, 42 U.S.C. §§ 1983 and 1985 (1970), and alleged that the defendants in this action, Temple's Board of Trustees and certain administrative officials of the University, had deprived them of rights secured to them by the First, Fifth and Fourteenth Amendments to the Constitution of the United States. Defendants did not answer the complaint. Instead, pursuant to Rule 56 of the Federal Rules of Civil Procedure, they filed a motion for summary judgment, challenging the subject matter jurisdiction of this Court. They asserted that Temple was a "purely private" institution and that, as a result, defendants' termination of plaintiffs' employment was neither "state action" for the purposes of the Fourteenth Amendment[1] nor action "under color of" state law for the purposes of 42 U.S.C. § 1983 (1970).[2] Plaintiffs then sought, and were granted, extensive discovery to enable them to determine the precise relationship between Temple and the Commonwealth of Pennsylvania (hereinafter "the Commonwealth"). At the close of the discovery process, both plaintiffs and defendants submitted comprehensive memoranda of law in support of their respective positions and vigorously defended those positions before this Court during oral argument.

The record thus developed reveals that for more than a decade Temple has attempted to walk nimbly on both sides of the line demarcating "state action" from "nonstate action." At any time its ultimate rationale seems solely dependent upon whether it is more profitable for

[1]. U. S. Constitution, Amendment XIV, § 1, provides in pertinent part: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

[2]. 42 U.S.C. § 1983 (1970) provides:
"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

Temple to adopt the "state action" or "nonstate action" mantle. When seeking an increased largesse from the state's treasury, the predominant pitch was that Temple should get more because it is a state-related institution, and with such salesmanship (or should we call it "statesmanship"), Temple has received more than 270 million dollars in direct appropriations or benefits over the last nine years. When confronted with the possibility of a vigorous federal enforcement of the National Labor Relations Act against Temple, once again Temple emphasized its state-related status as the basis of exemption from enforcement of the federal statute.[3] Though it succeeded in these instances by flying the flag of state-relatedness, Temple's position dramatically shifts in this forum where it is faced with a federal civil rights statute which is applicable to all institutions which function under color of any statute, ordinance, regulation, custom, or usage of any state. Temple's prior state-related voices have become muted; they now croon a counter lullaby that "after all, Temple is merely a private institution," and thus not subject to the "state action" prohibitions of the federal civil rights statutes.

Emerson once said "A foolish consistency is the hobgoblin of little minds." Temple can never be charged with having a little mind, but its adroit and nimble legal maneuvering has finally caught up with it. It must now either fish or cut bait. On the facts of record here, the cases require that all of Temple's actions be designated as "state action" under the Fourteenth Amendment and therefore action "under color of" state law under 42 U.S.C. § 1983 (1970).[4] While this conclusion as to Temple appears to me to be patently obvious, over the years there have been enough dicta in other cases and enough contrary results based on substantially different factual records that I am compelled to write an opinion more extensive in factual and legal analysis than it otherwise would have been. However, because of the remand in the University of Pittsburgh case to a judge in the Western District of Pennsylvania,[5] I have concluded that it is safer to err by excessive citation of the record than to fail to state what one might think is obvious. In any event, defendants' motion for summary judgment must be denied.

### The Origin of the Temple University-Commonwealth Act of 1965.

My analysis of the present relationship between Temple and the Commonwealth begins with a review of the genesis and legislative history of the Pennsylvania statute which controls that relationship, the Temple University-Commonwealth Act of 1965 (hereinafter "the Act"), 24 P.S. § 2510–1 et seq. The association between Temple and the Commonwealth which has been put in issue by defendants' motion for summary judgment began some ten years ago. The then Governor of Pennsylvania and his Budget Secretary suggested to Temple that it "explore means by which the Commonwealth and Temple University could develop an arrangement to provide greater educational opportunity at lower cost than was being provided at that time." (Plaintiffs' Supplemental Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, May 24, 1974 (hereinafter "Plaintiffs' Memorandum"), Exhibit B at 14.) In 1964, Temple officials responded to this suggestion and proposed such an arrangement. Their proposal led to the Temple University-Commonwealth Act of 1965, 24 P.S. § 2510–1 et seq. That the Commonwealth hoped to benefit substantially from the arrangement is in-

---

3. See Temple University v. District 65, Wholesale, Retail, Office & Processing Union, 194 N.L.R.B. No. 195 (1972).

4. The requirements for the invocation of both of these provisions are identical. Gibbs v. Titelman, 502 F.2d 1107, 1110 (3d Cir., 1974).

5. Braden v. University of Pittsburgh, 477 F. 2d 1 (3d Cir. 1973).

disputable. As one party to the many lengthy discussions that preceded the passage of the Act phrased it:

"The Commonwealth decided that this offered the Commonwealth an opportunity to do what it wanted to do in the least expensive way for the Commonwealth that possibly could be found and the quickest way—namely, to provide the educational opportunities at the kind of cost to the student. To build an entirely new institution, to start from scratch, not only was expensive and time-consuming—but also, because Temple University already had a very—an extensive public image as the kind of an institution that transition would be very easy from its former status to become a State-related institution." (Plaintiffs' Memorandum, Exhibit B at 15.)

The legislative history of the Act, as contained in the "Report of the Higher Education Committee, The House of Representatives, Commonwealth of Pennsylvania, 1965–1966 (hereinafter the "Report"), confirms the mutual benefits that Temple and the Commonwealth hoped to secure, and did in fact secure, through passage of the Act. (Defendants' Motion for Summary Judgment, December 26, 1973 (hereinafter "Defendants' Motion"), Affidavit of William G. Willis, Attachment 1.)

The Higher Education Committee called the Act "one of the high points of higher education legislation in Pennsylvania's recent history." (Report at 34.)

"By the enactment of this legislation, the Commonwealth has, for the first time, directly and explicitly made it a matter of public policy that opportunities for Higher Education should be expanded and that costs to the student should be reduced. Temple University will now be the instrumentality of the Commonwealth to implement this policy in southeastern Pennsylvania." (Id.)

The Act, the Committee foresaw, would allow Temple, by 1970, to expand its enrollment by 10,000 students. Further-

more, "the prevailing tuition charge for full-time Pennsylvania resident students will be more than cut in half." (Id. at 35.)

These benefits would flow to Temple because "[i]n essence, the Temple University-Commonwealth Act establishes a working partnership between the University and the State. Temple retains its private corporate identity, but the Commonwealth shares in the control of the institution" through the appointment of one-third of Temple's Board of Trustees and through the financial accountability provisions written into the Act." (Id.) The Act thus created an "organic relationship between Temple University and the Commonwealth" that is "the same as that between the Commonwealth and the Pennsylvania State University. Both of these institutions, while private in corporate identity, are invested with a quasi-public character and charged with certain public responsibilities, obligations and commitment." (Id.)

In a review of the factors that influenced it to recommend the relationship the Act established, the Committee singled out for special notice the need to expand enrollment and to reduce tuition in higher educational institutions within the Commonwealth, and the contribution that expanded opportunities for higher education could make to economic development. (Id. at 35–38.)

"Within the context of all of these considerations, as they focused on the critical area of southeastern Pennsylvania, the Committee on Higher Education quite naturally settled on Temple University as the institution which could best implement the objectives of the Committee and could best offer the advantages of a public university to that region." (Id. at 38.)

According to the Committee, the Temple-Commonwealth relationship actually began in 1962 when, after discussions between the then Governor of Pennsylvania and Temple's Board of Trustees, Temple agreed to accept six Common-

wealth Trustees on its board and to expand its undergraduate enrollment of students from Pennsylvania by 900, in return for an appropriation from the Commonwealth that would enable Temple to avoid a projected tuition increase and even reduce tuition by $100. (*Id.* at 38–39.) In fiscal 1963–1964 and 1964–1965, however, there were no Commonwealth appropriations for Temple, and the institution was forced to increase its tuition charges. At the same time, it was under "exceptionally heavy pressures for enrollment." (*Id.* at 39.) The net result was that in September of 1964, Temple's trustees approached the Commonwealth with a "Proposal for Cooperation." That proposal served as a basis for the discussions that led to the passage of the Act. (*Id.* at 2.)

In the conclusion of its report, the Committee stated that "the 'state-related' aspect of the Temple arrangement is of immense potential significance for the Commonwealth. All the advantages of a public university in southeastern Pennsylvania have been gained by the Commonwealth without incurring the extremely high costs that other states have incurred in taking such a step. Through the commonwealth representation and the post-audit controls incorporated into the legislation, the Commonwealth is assured of its rightful place in the control of the institution,[6] and the General Assembly is assured at all times of the right to require such information on the operations of the institution as will enable it to perform its proper legislative functions." [7] (*Id.* at 41.)

## The Provisions of The Temple University-Commonwealth Act of 1965.

As plaintiffs freely concede, "prior to the mid-1960's Temple University was, both in law and in fact, a 'purely private' institution whose actions were beyond the scope and reach of the Fourteenth Amendment." (Plaintiffs' Memorandum at 5.) With the passage of the Act, however, Temple's relationship to the Commonwealth underwent a significant change. In its legislative findings, the Pennsylvania State Legislature stated, *inter alia*, that Temple was "an integral part of a system of higher education in Pennsylvania, and that it [was] desirable and in the public interest to perpetuate and extend the relationship between the Commonwealth of Pennsylvania and Temple University for the purpose of improving and strengthening higher education by designating Temple University as a State-related university; . . . ." 24 P.S. § 2510–2(7). On the basis of this and related findings, the Legislature declared that the Act's purpose was "to extend Commonwealth opportunities for higher education by establishing Temple University as an instrumentality of the Commonwealth to serve as a State-related institution in the Commonwealth system of higher education." *Id.* The Act directed that Temple's name be changed to "Temple University—Of The Commonwealth System of Higher Education." 24 P.S. § 2510–3. It specified that, of Temple's thirty-six-member Board of Trustees, twelve would be designated Commonwealth trustees—four of whom would be appointed by the Governor with the ap-

---

6. One feature of this control, the Committee pointed out, is the legislature's capacity to regulate the mix of out-of-state and resident students at Temple through the promulgation of widely disparate tuition schedules. (Report at 40–41.)

7. It is true, as defendants have noted, that the Committee later said that "[r]esponsibility for the declaration and administration of educational policy is lodged where it properly belongs—in the officers and trustees of the University—and the institution is assured of its freedom to experiment and develop within the framework of its unique tradition and its special commitment to the Commonwealth." (Report at 42.) The phrase "within the framework of . . . its special commitment to the Commonwealth," however, significantly qualifies the rest of the statement. That commitment entails an increasing dependence on Commonwealth funds. It is inconceivable then that the same commitment does not also involve a meaningful limitation on the freedom that Temple enjoyed prior to passage of the Act.

proval of a two-thirds majority of the Pennsylvania State Senate, four by the President pro tempore of the Senate, and four by the Speaker of the House of Representatives—and that the Governor of Pennsylvania, the Superintendent of the Department of Public Instruction (whose official title has since been changed to Secretary of the State Department of Education), and the Mayor of Philadelphia would be members of the Board *ex officio*. 24 P.S. § 2510–4(a) and (b). The Act directed Temple to maintain precisely those tuition and fee schedules for Pennsylvania resident and non-Pennsylvania resident full-time students that were set forth by the legislature in its annual act making appropriations to Temple, so long as those appropriations sufficed to meet the tuition and fee schedules. 24 P.S. § 2510–6. The Act provided that Temple would share comparably with land grant institutions of higher learning and state colleges in the benefits available under Commonwealth programs for capital development and improvement, and that the Commonwealth might, by agreement with Temple's Board of Trustees, erect and equip buildings, and provide facilities, for Temple's use. 24 P.S. § 2510–7. The Act required Temple to present certified payrolls and vouchers before it would receive the funds appropriated by the Legislature; gave the State Auditor General the right to post-audit all expenditures of appropriated funds; required Temple to set up a special Commonwealth Appropriations Account for those funds; restricted the expenditure of those funds to the purposes for which they were appropriated; required Temple to maintain proper records of those expenditures; directed Temple to file with the Commonwealth a detailed statement of those expenditures; gave the State Auditor General the right to review all expenditures made by Temple and, in the case of expenditures from the Commonwealth Appropriations Account, the right to audit and disallow expenditures for purposes not permitted by the annual appropriations act. 24 P.

S. § 2510–8. The Act further permitted Temple to issue tax-exempt bonds, 24 P. S. § 2510–9, and required Temple's President to submit to the Governor and the Legislature, through the Board of Trustees, an annual "report of all the activities of the university, instructional, administrative and financial . . ." 24 P.S. § 2510–10.

Even this brief survey of the Act's provisions reveals that the enactment profoundly altered the relationship between Temple and the Commonwealth. The Act designated Temple as an instrumentality of the Commonwealth; incorporated it, as a state-related institution, into the Commonwealth's system of higher education; changed Temple's name; reorganized Temple's Board of Trustees, one-third of whom would thereafter be appointed by elected public officials of the Commonwealth; authorized the Legislature to set fee and tuition schedules for all full-time Temple students; gave Temple access to Commonwealth funds for capital development and to buildings and facilities erected at Commonwealth expense; made Temple accountable to the Commonwealth for the public monies it received; empowered Temple to issue tax-exempt bonds; and required Temple to report annually to the Commonwealth on all of its activities, not merely its financial affairs.

While a review of the Act is instructive in assisting the Court to determine the present relationship between Temple and the Commonwealth, it does not delineate with adequate specificity the precise details of the relationship. The Act became effective on July 1, 1965. For the past nine years, Temple has been subject to the Act's provisions in the conduct of its affairs. History has put flesh on the bare bones of the legislative enactment. This review of the Act must therefore be supplemented by an examination of the Temple-Commonwealth relationship in the nine years subsequent to the passage of the Act. The Court of Appeals for this Circuit has ordered just such a factual examination in a case in-

volving an institution that stands in virtually the same relationship to the Commonwealth as does Temple. Braden v. University of Pittsburgh, supra.

### The Implementation of The Temple University-Commonwealth Act of 1965.

For both laymen and lawyers alike, the most significant aspect of the relationship between Temple and the Commonwealth initiated by the 1965 Act has been the transfer of substantial amounts of public funds to Temple, on an annual basis, under the provisions of the Act. Prior to passage of the Act, Temple did receive appropriations from the Commonwealth, but those sums never exceeded $6,515,744.00 in a single fiscal year. With the passage of the Act, the sums appropriated by the Commonwealth increased dramatically in absolute dollar amounts and, with one exception, have consistently risen in each subsequent fiscal year. The following chart states the appropriated funds in both absolute dollar amounts and as percentages of Temple's operating income for each fiscal year. It reveals that the word "substantial" is not used inadvisedly in describing this transfer of funds.

| Year | Commonwealth Appropriation | Percent of Temple's Operating Income From Commonwealth |
|---|---|---|
| 1965–1966 | $11,547,266.00 | 23.0% |
| 1966–1967 | $20,106,998.00 | 32.7% |
| 1967–1968 | $28,061,146.00 | 35.6% |
| 1968–1969 | $33,440,567.00 | 36.6% |
| 1969–1970 | $41,392,000.00 | 37.7% |
| 1970–1971 | $41,392,000.00 | 33.1% |
| 1971–1972 | $44,568,000.00 | 32.2% |
| 1972–1973 | $49,711,000.00 | 33.7% |

(Defendants' Answer to Interrogatory #3; Plaintiffs' Memorandum, Exhibit A at 6–7.)

———◆———

Projected transfers of funds for the future are even higher, both in dollar amount and percentage of annual operating income. Temple itself, in a brief filed with the National Labor Relations Board, estimated that in 1975–1976 the Commonwealth appropriation to the University pursuant to the Act will total $94,500,000.00, and that that sum will constitute 54.2% of Temple's annual operating income. (Plaintiffs' Memorandum, Exhibit A at 7.)[8] These percentages are calculated on the basis of Temple's total operating income, which includes revenues from the Temple University Hospital and its clinics. (Plaintiffs' Memorandum, Exhibit B at 19–22.) When revenues from the hospital are excluded, the amount of state subsidy as a percentage of Temple's general operating income rises even higher. Since the 1966–1967 fiscal year, that percentage has never dipped below 54.4% and is projected to supply fully 65.5% of Tem-

8. In the same brief, Temple noted that if federal funds were included in the calculation, the institution's percentages of annual operating income received from public sources during the fiscal years 1965–1966 through 1969–1970 would rise respectively to 34%, 46.2%, 49.9%, 51% and 51.6%. Plaintiffs have called this admission to the Court's attention but, while it lends support to their contention that Temple is not a "purely private" institution, it is ultimately irrelevant to the present inquiry, whose focus is on state, not federal involvement. Direct receipt of federal funds, in whatever amount, can never result in "state action." Grossner v. Trustees of Columbia University, 287 F.Supp. 535 (S.D.N.Y.1968).

ple's general revenues by fiscal 1975–1976. (Plaintiffs' Memorandum, Exhibit D.)

Pursuant to the provisions of 24 P.S. § 2510–7, the Commonwealth has also funded a substantial expansion of Temple's physical facilities. In 1965, the Commonwealth's investment in buildings at Temple was $10,000,000.00. Six years later, in 1971, the Commonwealth was in the process of constructing $50,000,000.00 worth of physical facilities for Temple, and had approved capital programs for an additional $79,000,000.00 worth of facilities at Temple. In 1970, Temple's own investment in its physical plant totalled $50,000,000.00. In 1971, Temple was itself building $11,000,000.00 worth of physical facilities, and planning to spend an additional $10,000,000.00 for capital development. (Plaintiffs' Memorandum, Exhibit A at 7.) These figures indicate that the Commonwealth has, since the passage of the Act, assumed an ever-increasing share of the responsibility for Temple's capital development. Indeed, by the 1972–1973 fiscal year, the Commonwealth and its General State Authority owned 41.9% of all land, buildings and equipment at Temple; the total assessed value of these Commonwealth-owned facilities was $63,304,994.-00. (Defendants' Answer to Interrogatory # 22.) Temple itself concedes that "in the near future the greater part of the physical plant at Temple will be owned by the State." (Plaintiffs' Memorandum, Exhibit A at 18 n. 11.)[9]

Temple has characterized the process by which it secures appropriations from the Commonwealth as "similar to that of any board or department of the state government." (Plaintiffs' Memoran-

dum, Exhibit A at 9.) That process requires a close and continuing relationship between Temple's officers and officials of the Commonwealth. In 1971, William G. Willis, then vice-president and secretary of Temple and secretary of Temple's Board of Trustees, offered this description of the process as it developed after the passage of the Act:

"Well, because Temple is a State-related institution, the budgetary process and the appropriations process is, of course, much more closely a matter of discussion and of conferences between State officials and the university than it was in years past. The process, to put it as simply as I can, is that each year, at the discretion of the Secretary of the Budget, we must submit our plans, our fiscal plans, our budget, for—for the coming year. We must make an appropriation request and submit that to the Secretary of Education, and the Secretary of Education then—his staff, together with our people—and I'm very much involved in it throughout all these steps—through a series of discussions and conferences arrive at some point where the Department of Education —technically, the State Board—the State Council of Higher Education— the State Board of Education—transmits to the Governor's Budget Secretary a recommendation for an appropriation for Temple for the coming year." (Plaintiffs' Memorandum, Exhibit B at 18–19.)

Temple's participation in the appropriations process does not cease with the transmission of this recommendation to the Governor. If Temple's officers are dissatisfied with the Secretary of Education's recommendation, they have an

---

9. Plaintiffs in their memorandum have called the Court's attention to a variety of contracts and grants involving the transfer of public funds to Temple from the Commonwealth Departments of Public Welfare, Education, Justice, Environmental Resources, Public Instruction, Labor and Industry, Transportation, Community Affairs and Military Affairs. (Plaintiffs' Memorandum at 15.) Though these contracts and grants

also involved substantial sums, a total of $5,468,409.00 in the fiscal years 1970–1971 and 1971–1972, id. and Exhibit F, they are not relevant to the current inquiry. The significant additional factors of state involvement present here make it unnecessary for me to determine whether the receipt of state funds by a private institution pursuant to a contractual relationship can transform that institution into a state instrumentality.

opportunity to lobby for changes with the Governor and his Budget Secretary. If they fail to persuade the Governor to increase Temple's share of the Commonwealth's educational pie, they may argue for a larger state subsidy during mandatory appearances before the appropriations committees of both houses of the Pennsylvania legislature. Through 1971, these lobbying efforts before the legislature were uniformly successful. In the words of Mr. Willis, "[s]ince we became state-related, the modifications of the House and Senate Appropriation Committee [sic] have been in our favor —in other words, they have increased the appropriation, not decreased it." (Plaintiffs' Memorandum, Exhibit B at 20–21.)

In light of the substantial sums annually transferred to Temple by the Commonwealth, it is not surprising that the Commonwealth holds Temple accountable for the expenditure of those monies. Indeed, the Act itself mandates this accountability. 24 P.S. § 2510–8. The primary mechanism by which this accountability is achieved is an annual four-to-five week audit of Temple's finances conducted by the Commonwealth's Auditor General.[10] (Plaintiffs' Memorandum, Exhibit A at 9.) Another accountability mechanism is the report on "all the activities of the university, instructional, administrative and financial," which the Act requires Temple's President to submit annually to the Governor and the Legislature. 24 P.S. § 2510–10. Temple has admitted that the necessity of accounting for the expenditure of funds received from the Commonwealth has significantly reduced Temple's previous autonomy from the Commonwealth. "Along with the state funds has come a meaningful measure of state control over Temple." In context,

this relates to Temple's Board of Trustees (Plaintiffs' Memorandum, Exhibit A at 19), but Temple later conceded that "[t]here can be no denying the powerful influence of the 'power of purse' which recurs every year with each year's request for appropriations and for capital projects and the review of prior year's spending." (*Id.* at 21 n. 13.)

In line with the statutory policy of holding Temple accountable for the expenditure of appropriated funds received from the Commonwealth, the Legislature has, on at least two occasions, required Temple to submit detailed reports on the productivity of its faculty. See Act 68A, December 6, 1972, § 6 (Defendants' Motion, Exhibit F); Act 24A, November 15, 1973, § 6 (Defendants' Motion, Exhibit G.)

Temple protested against inclusion of this requirement in the 1972 Act, but in vain. (Defendants' Answer to Interrogatory # 46). In compliance with the commands of Act 68A, Temple duly prepared a reporting form which left little doubt about who had asked for the report. One of the form's directions read:

> "The FACULTY ACTIVITY REPORT will be machine processed to meet the deadlines set by the PENNSYLVANIA LEGISLATURE" (Capitalization in original). (Plaintiffs' Memorandum, Exhibit H.)

In addition to the statistics on faculty productivity, the report required by Act 68A was to include "[r]ecommendations of a formula to be applied in the determination of annual appropriations made to the university." The formula was to "be directed toward providing financial incentives to maintain an average faculty teaching assignment equivalent to twelve credits per semester. . . ." (Defendants' Motion, Exhibit F.)

---

10. It is interesting to note that such an audit, if conducted of the financial affairs of a parochial school, would most likely constitute an "excessive entanglement" of the state with the affairs of a religious group under the No Establishment Clause of the First Amendment. Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971).

The standards of review are different, of course. The threshold for "excessive entanglement" under the First Amendment is far lower than for "state action" under the Fourteenth Amendment or for action "under color of" state law under 42 U.S.C. § 1983 (1970).

As the previous review of the provisions of the Act indicates, the latter significantly changed the structure and mode of appointment of Temple's Board of Trustees, vesting the power of appointment for twelve Trustees, one-third of the total Board, in three elected officials of the Commonwealth. The changes have produced a more diverse Board than would otherwise have existed. For example, on at least one occasion, an elected official has exercised that power of appointment to select a person as a Commonwealth Trustee despite the firm opposition of the University Trustees to the appointment of that individual. (Plaintiffs' Memorandum, Exhibit J–2, at 54.) The changes have also, in all likelihood, facilitated exchanges of information about issues before the Board between Commonwealth Trustees and officials of the Commonwealth. (Plaintiffs' Memorandum, Exhibit J–2 at 59–61). Commonwealth Trustees have, in Temple's own estimation, played "a prominent role in the Board's affairs." (Plaintiffs' Memorandum, Exhibit A at 8.) At present three of them serve on the Board's nine-member executive committee, the most important of the Board's standing committees because it is empowered to act for and on behalf of the entire Board. (Defendants' Answer to Interrogatory # 76(e)–(h); By-Laws, Art. IV, Section 1.D, in Defendants' Motion, Affidavit of William G. Willis, Attachment 2). In the recent past, as many as four members of the executive committee, including its chairman, have been Commonwealth Trustees. (Defendants' Answer to Interrogatory # 76(e)–(h).) Commonwealth Trustees have constituted at least one-third of the membership of the three next most important standing committees, those on Building and Finance, on Educational Policies, and on Health Sciences. Since 1969, the chairmen of those committees have, more often than not, been Commonwealth Trustees. (Defendants' Answer to Interrogatory # 76(e)–(h).)

Temple's special relationship with the Commonwealth has conferred a variety of other financial benefits, both direct and indirect, on the institution. In the year following the passage of the Act, for example, the subsidy Temple received from the Commonwealth enabled it to reduce tuition for Pennsylvania residents from $920.00 a year to $450.00 a year. (Plaintiffs' Memorandum, Exhibit A at 7.) Several years later, in 1973, the then President of Temple, Paul R. Anderson, provided a first-hand assessment of the import of the Act on the institution in "The Search For Balance," a report on Temple's activities from 1967 to 1973. After the passage of the Act, Mr. Anderson wrote, "Temple almost immediately began a startling metamorphosis which is still not complete." He went on to explain that

"[t]he years which have followed the Commonwealth Act are a story of dramatic growth in size, in capacity for public service and in institutional stature. Within a few short years undergraduate enrollment increased by 25%, full-time graduate enrollment by 300%, an increase from 6,545 to well over 9,300 in graduate studies if part-time students are included. Full-time faculty ranks rose to over 1,900. Sponsored research and program development and training grants increased from a ten million dollar base to over 23 million as governmental agencies drew increasingly on Temple's resources and talent, especially in the health areas." (Defendants' Motion, Affidavit of Marvin Wachman, Attachment 3).

By reason of its special status vis-a-vis the Commonwealth, Temple was able to argue successfully before the National Labor Relations Board that the Board should not assume jurisdiction over its employees because it was "a quasi-public institution." (Plaintiffs' Memorandum, Exhibits A and C; Temple University v. District 65, Wholesale, Retail, Office & Processing Union, *supra.*) On at least two occasions since the passage of the

Act, Pennsylvania state courts, at Temple's request, have held pursuant to Rule 1531(b) of the Pennsylvania Rules of Civil Procedure, 12 P.S. Appendix, that Temple, as "an instrumentality of the Commonwealth," need not post security in injunction proceedings. (Plaintiffs' Memorandum, Exhibit A at 9–10). On at least three occasions since it acquired "quasi-public" status, Temple has filed, together with donors who have given real estate to it, petitions for exemption from Pennsylvania's Realty Transfer Tax, arguing that the respective petitions should be granted because of its special status as "an instrumentality of the Commonwealth." (Defendants' Answer to Interrogatory # 36(b).) Finally, on December 12, 1973, the Executive Committee of Temple's Board of Trustees, acting for the entire Board and mindful of § 103 of the Internal Revenue Code of 1954 which, *inter alia*, excludes from gross income the interest received on the obligations of a State or a political subdivision thereof, authorized Temple's officers "to enter into agreements under which the institutions which lend money to the University would recognize the University's status as an instrumentality of the Commonwealth and treat interest paid by the University as tax-exempt under the Internal Revenue Code, thereby substantially reducing the rates of such interest." (Plaintiff's Memorandum, Exhibit N.)

While its special relationship with the Commonwealth brought numerous benefits to Temple, some of them listed above, the same relationship nevertheless burdened the institution with some concomitant disadvantages. It became even more dependent on steadily increasing subsidies from the Commonwealth. When the subsidy was not increased from one year to the next, or when the appropriation of the subsidy was delayed, Temple was plunged into acute financial crises. For example, the Commonwealth appropriation for 1970–1971 was no higher than the subsidy for 1969–1970. The then President of Temple, Paul R. Anderson, described the impact of the legislature's failure to increase the institution's subsidy in his "Report of the President 1970–1971," which he submitted to the Governor and the legislature pursuant to 24 P.S. § 2510–10:

> "An austerity program was immediately introduced. The contingency fund was entirely eliminated. Every possible postponement in maintenance and renovation were effected. A job freeze was announced, prohibiting new faculty appointments and replacements. Allotments for travel, food items, printing and other similar expenses were drastically reduced. In view of the fact that payment of the second half of the Commonwealth's 1970–1971 appropriation was put off until 1971–1972, the University had been forced to use its credit with the banks so that by the end of the fiscal year the Board of Trustees had authorized an unprecedented debt limit of 40 million dollars. The University had been borrowing at the rate of $5 million a month to meet payrolls and to satisfy our most pressing creditors. The net result of these austerity moves was to scale this deficit down to somewhere in the vicinity of 1.5 million, exclusive of the hospital."

(Defendants' Answers to Interrogatories, Attachment.)

In 1974, after the Commonwealth's 1973 subsidy to Temple was delayed, the institution's alumni magazine described the resulting situation as a "financial crisis that lasted for more than four months." According to this publication, "[t]he University had been operating without state funds since the new fiscal year began on July 1. The delay, caused by the failure of the state House and Senate to agree on the amount, had forced Temple to borrow from local banks at heavy interest rates. As the University's debt mounted, its ability to obtain credit declined, causing a money shortage which in November raised the unrealized possibility that the payroll would not be met." The appropriation,

which was signed into law by Pennsylvania's Governor in mid-November, 1973, totalled $52.5 million. The alumni magazine pointed out that the figure was "more than the amount allotted to the entire higher education systems in each of 12 other states." (Plaintiffs' Memorandum, Exhibit K.)

In sum, then, the history of the Temple-Commonwealth relationship as it has developed under the Act shows, *inter alia*, substantial annual transfers of public monies to Temple from the Commonwealth; a major expansion of Temple's physical facilities, which was made possible by Commonwealth subsidies; intensive contacts between Temple and the Commonwealth throughout the annual budgetary process; continuing oversight by the Commonwealth of all of Temple's affairs through the mechanisms of annual audits and reports and, on two occasions at least, faculty productivity studies; an important contribution by Commonwealth-appointed trustees to the management of Temple's affairs the reaping, by Temple, of a variety of other benefits from its special relationship with the Commonwealth; and an increasing dependence by Temple on the prompt appropriation of anticipated Commonwealth subsidies. It is surely no exaggeration to say that, on the basis of this record, the Commonwealth has significantly involved itself in Temple's affairs.

## DISCUSSION

*The Prerequisites of State Action.*

The issue presented by defendants' motion for summary judgment requires this Court to answer one of the most recurrent and most difficult questions in the entire area of constitutional law: when does a state's involvement in the conduct of a private party justify the imposition on that private party of the significant restraints placed on the state

itself by the Constitution through the Fourteenth Amendment? In other words, this Court is called upon to determine how much state action in a particular set of circumstances is "state action" within the meaning of the Fourteenth Amendment and action "under color of" state law for the purposes of 42 U.S.C. § 1983 (1970).[10A]

■ In the past Courts have found "state action" in a broad spectrum of factual situations: a pervasive state regulatory system for taverns, Seidenberg v. McSorley's Old Ale House, Inc., 308 F.Supp. 1253 (S.D.N.Y.1969); state and municipal participation in the staging of a World's Fair, Farmer v. Moses, 232 F.Supp. 154 (S.D.N.Y.1964); state licensing of barber schools, Grier v. Specialized Skills, Inc., 326 F.Supp. 856 (W.D.N.C.1971); municipal sponsorship of a bicentennial corporation, Leslie v. Philadelphia 1976 Bicentennial Corporation, 332 F.Supp. 83 (E.D.Pa.1971); municipal support for a private library corporation, Kerr v. Enoch Pratt Free Library of Baltimore City, 149 F.2d 212 (4th Cir. 1945); the repeal, through amendment of a state constitution, of a law forbidding discrimination in housing, Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967); the likely resegregation, under the direction of private trustees, of a formerly public and integrated park, Evans v. Newton, 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966), but cf. Evans v. Abney, 396 U.S. 435, 90 S.Ct. 628, 24 L.Ed.2d 634 (1970); the association of a state with a private institution in a manner that suggested state approval of the institution's discriminatory policies, Commonwealth of Pennsylvania v. Brown, 270 F.Supp. 782 (E.D.Pa.1967), aff'd, 392 F.2d 120 (3d Cir.), cert. denied, 391 U.S. 921, 88 S.Ct. 1811, 20 L.Ed.2d 657 (1968); orders of a public service commission, issued pursuant to state stat-

10A. For an analysis of circumstances where private action is subject to the prohibitions of the Thirteenth, Fourteenth and Fifteenth Amendments, see Commonwealth of Pennsyl- vania v. Local Union No. 542, International Union of Operating Engineers, 347 F.Supp. 268, 291–301 (E.D.Pa.1972).

utes, that required segregated facilities in a railroad terminal, Baldwin v. Morgan, 287 F.2d 750 (5th Cir. 1961); the fraudulent use, by private process servers, of a state's machinery for the service of process, United States v. Wiseman, 445 F.2d 792 (2d Cir. 1971); state participation in a redevelopment project that included a segregated motel, Smith v. Holiday Inns of America, Inc., 336 F. 2d 630 (6th Cir. 1964); the coordinated effort of a municipal recreation department and a private agency to provide recreational programs for a city's youth, Smith v. Young Men's Christian Association of Montgomery, 316 F.Supp. 899 (M.D.Ala.1970); a city's retention of a reversionary interest in two formerly municipal golf courses after their sale to private owners, Hampton v. City of Jacksonville, 304 F.2d 320 (5th Cir. 1962); the granting of a special municipal franchise for bus transportation to a public utility, Boman v. Birmingham Bus Co., 280 F.2d 531 (5th Cir. 1960); the lease of cafeteria space in a county court house to a private party, Derrington v. Plummer, 240 F.2d 922 (5th Cir. 1956), cert. denied, 353 U.S. 924, 77 S.

Ct. 680, 1 L.Ed.2d 719 (1957); and the leasing to a private restaurant of space within a public parking facility, Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961).[11]

■ Even a cursory review of this broad range of cases reveals that a state's involvement in the activity under attack need not "be either exclusive or direct. In a variety of situations the Court has found state action of a nature sufficient to create rights under the Equal Protection Clause even though the participation of the State was peripheral, or its action was only one of several co-operative forces leading to the constitutional violation." United States v. Guest, 383 U.S. 745, 755, 86 S.Ct. 1170, 1177, 16 L.Ed.2d 239 (1966).[12] Similarly, "[t]o act 'under color' of law does not require that the accused be an officer of the State. It is enough that he is a willful participant in joint activity with the State or its agents." United States v. Price, 383 U.S. 787, 794, 86 S. Ct. 1152, 1157, 16 L.Ed.2d 267 (1966) (Footnote omitted). In Justice Frankfurter's words, "[t]he vital requirement

11. Defendants rightly point out that the leading case in the area of "state action," Burton v. Wilmington Parking Authority, supra, involved racial discrimination and that the instant case does not. They might have gone further and noted, with considerable support in the other cases cited above, that federal courts have been quick to find "state action," even in cases of limited state involvement, when the specter of discrimination on the basis of race has lurked in the background. Often, it would seem, courts have been influenced in their determinations of the preliminary, jurisdictional question—whether "state action" exists—by the particular invidiousness of the constitutional violation alleged. When viewed in this context, defendants' citation of Burton, supra, implicitly suggests that courts generally, and this Court in particular, should be more reluctant to find "state action" in cases which do not involve racial discrimination. I decline to accept that suggestion. It is difficult, and perhaps impossible, to arrange federal constitutional rights in an ascending hierarchy of value. What is clear is that any deprivation of such a right, whether to the equal protection of the laws as guaranteed

by the Fourteenth Amendment or to the freedoms of speech and association as guaranteed by the First Amendment, is a matter of extreme importance to the person who suffers the deprivation. It is equally clear that the courts should be especially sensitive to any such deprivation, whether it involves a black man who is refused service in a segregated restaurant, as was the case in Burton, supra, or two faculty members who were fired for speaking their minds about a university's publication policies, as is purportedly the case here. The freedoms of speech and association have been held so fundamental to the concept of ordered liberty that they have been incorporated into the Due Process clause of the Fourteenth Amendment. Edwards v. South Carolina, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 687 (1963). Clearly, then, the courts should be alert to their infringement "under color of" state law, and quick to vindicate them if they have in fact been curtailed.

12. Though rights under the Equal Protection Clause are not at issue here, plaintiffs have alleged violations of other precious rights, those of freedom of speech and association.

is State responsibility—that somewhere, somehow, to some extent, there be an infusion of conduct by officials panoplied with State power . . . ." Terry v. Adams, 345 U.S. 461, 473, 73 S.Ct. 809, 815, 97 L.Ed. 1152 (1953) (Frankfurter, J., separate opinion).

■ Thus it is altogether possible that in some cases, though a state's over-all involvement with a private person or institution is minimal, "state action" may exist because the state *is* intimately connected with the particular activity complained of. In Coleman v. Wagner College, 429 F.2d 1120 (2d Cir. 1970), for example, where the disciplinary regulations of a private denominational college were challenged on "state action" grounds, the Court of Appeals remanded the case to the district court, even though the record showed no evidence of "state action" generally. The Court reasoned that a recently enacted state education law, which required all colleges to promulgate their disciplinary regulations as a condition for receiving any state aid, might well have encouraged the defendant college to adopt more stringent rules than it otherwise would have. If there was such encouragement, the Court said, then the regulations would be "state action."

*"State Action" In Higher Education.*

One area where the "state action" question has been posed with increasing frequency in recent ·years is that of higher education, generally in cases that involve either student discipline or faculty employment practices. See, *e. g.,* Grafton v. Brooklyn Law School, 478 F. 2d 1137 (2d Cir. 1973); Brown v. Strickler, 422 F.2d 1000 (6th Cir. 1970); Powe v. Miles, 407 F.2d 73 (2d Cir. 1968); Belk v. Chancellor of Washington University, 336 F.Supp. 45 (E.D. Mo.1970); Esteban v. Central Missouri State College, 290 F.Supp. 622 (W.D.

Mo.1968); Grossner v. Trustees of Columbia University, *supra.*

■ It is, of course, relatively easy for a court to determine that "state action" exists where an institution of higher education falls incontrovertibly within the class commonly thought of as "state colleges or universities." Esteban v. Central Missouri State College, *supra.* The same is true for municipal institutions that receive substantial financial support from governmental sources. Brown v. Strickler, *supra.* That determination however, is not so facilely made about formally "private" institutions, even though some courts have resolved the issue without apparent difficulty through application of a "public function" theory. Belk v. Chancellor of Washington University, *supra*; see Guillory v. Administrators of Tulane University, 203 F.Supp. 855 (E.D.La.1962).[13] The "public function" theory has a pleasing simplicity about it, and would permit summary disposition of the issue presently before this Court. It is, however, a slender analytical reed upon which to lean, for it admits of practically no limitation. Every individual or institution performing a function that the state, in its own panoply of activities, performs, would become an agent of the state. "State action" would be present in the operation of every nonpublic school, for example, because education is surely a state function. Such an expansion of the scope of the Fourteenth Amendment would be clearly unwarranted, and I hazard no such expansion here. See Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972).

On the other hand, there have been a series of cases involving formally "private" institutions where courts, after consideration of the indicia of state involvement, have concluded that such involvement was not so substantial that it justified a finding of "state action."

13. The decision in Guillory, *supra,* did not rest solely on a "public function" theory. The record revealed a variety of factors that established a substantial and continuing relationship between the state of Louisiana and Tulane University.

See, *e. g.*, Grafton v. Brooklyn Law School, *supra*; Powe v. Miles, *supra*; Grossner v. Trustees of Columbia University, *supra*.

### Temple and "State Action".

 None of these cases, whether "state action" was found or not, squarely controls the result in the instant case, because Temple University, since the passage of the 1965 Act, has been, and continues to be, a hybrid. It claims, and the Commonwealth supports that claim, that it has retained its private corporate identity. On the other hand, it is a "state-related institution" and an "instrumentality of the Commonwealth." Its name was altered to reflect its quasi-public status; its statutory incorporation into the Commonwealth system of higher education reflects the same status. It is by no means totally dependent on public support, but it does receive a substantial portion of its income—one-third of its total revenues, and more than one-half of its general revenues—from Commonwealth appropriations. It has a multi-million dollar physical plant of its own, yet uses millions of dollars worth of land and buildings to which the Commonwealth holds title. Two-thirds of its trustees are elected by the Board of Trustees itself, but the other one-third are appointed by elected officials of the Commonwealth.[14] The Commonwealth is not liable for its debts, but it does enjoy some of the prerogatives traditionally bestowed on state agencies,

for example, the power to issue tax-exempt bonds. Sometimes, it seems, Temple itself does not know whether it is public or private.[15]

The issue presented by this case is not one of first impression in this Circuit, but it remains unresolved. In Braden v. University of Pittsburgh, 343 F.Supp. 836 (W.D.Pa.1972), the district court dismissed a § 1983 action, brought against the University and alleging sex discrimination, on the ground that plaintiffs had failed to show that the institution's activities constituted "state action" or were conducted "under color of" state law.[16] On appeal, however, the Court of Appeals for the Third Circuit reversed, and remanded the case to the district court so that the latter could compile a comprehensive record that would set out in precise detail the relationship between the University and the Commonwealth as it has developed since the passage of the 1966 Act. Braden v. University of Pittsburgh, 477 F.2d 1 (3rd Cir. 1973). Mindful of the commands of *Braden, supra*, I refrained from ruling on defendants' motion for summary judgment until a similarly comprehensive record had been compiled in the instant case. That record now exists, and my reading of it compels the result I reach here.

The leading case in the entire "state action" area is Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S. Ct. 856, 6 L.Ed.2d 45 (1961)[17] which was reaffirmed and authoritatively in-

---

14. Plaintiffs have argued strenuously that this power of appointment, along with the active participation of Commonwealth Trustees in the work of the Board's standing committees, gives the Commonwealth effective control over the Board and, through it, over Temple itself. The record, however, is devoid of any evidence which would indicate that the Commonwealth Trustees have in fact controlled Temple for the Commonwealth, or have even attempted to do so. Accordingly, I do not base my decision on the "control" theory plaintiffs have proposed.

15. See the Introduction to this Opinion, supra.

16. The University of Pittsburgh's relationship with the Commonwealth of Pennsylvania is, in all relevant aspects, virtually identical to that of Temple with the Commonwealth. Compare the University of Pittsburgh—Commonwealth Act of 1966, 24 P.S. § 2510–201 et seq., with the Temple University-Commonwealth Act of 1965, 24 P.S. § 2510–1 et seq.

17. The Court of Appeals for the Third Circuit has held that Burton, *supra*, controls the issue presented by defendants' motion for summary judgment in the instant case. Braden, *supra*, 477 F.2d at 4.

terpreted in Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed. 2d 627 (1972). In *Burton*, the "state action" claim rested on the leasing of space within a public parking facility to a private restaurant owner; in *Moose Lodge*, on the licensing by a state's liquor control board of a private social club. In both cases, the alleged constitutional violation was the failure of the private party to serve Negro patrons. The doctrine enunciated in *Burton* and refined in *Moose Lodge* leads ineluctably to the conclusion that "state action" is present in the instant case.

Justice Clark, writing for the Court in *Burton*, conceded that it is often difficult to determine when "state action" in fact exists: "Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance." 365 U.S. at 772, 81 S.Ct. at 860. That is the approach to be followed in all "state action" cases, and it is the approach that I follow here. In *Burton*, the crucial facts and circumstances were the public ownership of the land and the building where the restaurant was located, the public use to which the building was dedicated, the assumption by the City of Wilmington of the costs of acquisition, construction and maintenance for the parking facility, a variety of incidental benefits that flowed to both the public agency and the restaurant from their lessor-lessee relationship, and the contribution that profits earned by discrimination made to the financial success of the public agency. In Justice Clark's words, "[a]ddition of all these activities, obligations and responsibilities of the Authority, the benefits mutually conferred, together with the obvious fact that the restaurant is operated as an integral part of a public building devoted to a public parking service, indicates that degree of state participation and involvement in discrimina-

tory action which it was the design of the Fourteenth Amendment to condemn." 365 U.S. at 724, 81 S.Ct. at 861. Here the indicators of "state participation and involvement" are different, but they lead to the same conclusion.

The result in *Burton* rested to some extent on the "[a]ddition of all [the] activities, obligations and responsibilities" of the parking authority. 365 U.S. at 724, 81 S.Ct. at 861. Certainly the "activities, obligations and responsibilities" of the Commonwealth are many and varied in the instant case. It has incorporated Temple into its own system of higher education. It has renamed Temple. Through its elected officials, it appoints one-third of Temple's Board of Trustees. It sets fee and tuition schedules for Temple's students, and appropriates millions of dollars to Temple to enable the institution to maintain those schedules. It has funded a sizable portion of Temple's present capital development, and plans to fund an overwhelming share of the institution's projected capital development. Through an extensive audit, it holds Temple accountable for the expenditure of the funds it has appropriated to the institution. It enjoys a right of review over Temple's budget generally. It has authorized Temple to issue tax-exempt bonds. Finally, it requires Temple's chief executive officer to file annual reports on all of the institution's affairs, "instructional, administrative and financial." [18] In my judgment, the present record presents a picture of Commonwealth participation and involvement that is far more extensive than the "activities, obligations and responsibilities" of the parking authority that contributed to the result in *Burton*.

According to the Court, the unique relationship between the restaurant and the parking authority conferred on both, in addition to the normal consideration

18. It is true, as defendants point out, that the Commonwealth is not responsible for Temple's debts, but neither was the parking authority in Burton responsible for the res-

taurant's debts. This kind of financial responsibility is clearly not essential to support a finding of "state action."

attendant upon any lessor-lessee relationship, "an incidental variety of mutual benefits." 365 U.S. at 724, 81 S.Ct. at 861. The great bulk of the mutual benefits in the instant case can scarcely be described as "incidental." They were clearly visualized by both parties beforehand, and deliberately incorporated into the Act. Two major benefits accrue to the Commonwealth: through Temple, it is able to provide relatively inexpensive higher education for its residents in southeastern Pennsylvania; and, again through Temple, it is able to discharge that public responsibility at far less cost to itself than if it had to establish a similar institution on its own. The benefits that Temple receives have been recited in some detail earlier in this opinion. Chief among them is the massive sums of public monies supplied by the Commonwealth to Temple for operating expenses and capital development. Temple has reaped some other incidental advantages from the relationship: it was not required to post security in two injunction proceedings; gifts to it are exempt from Pennsylvania's Realty Transfer Tax; and it certainly hopes to capitalize on its state-related status by assuming debt obligations on which it will pay significantly lower rates of interest because the interest itself will be exempt from federal income taxation.

Justice Clark also noted "the obvious fact that the restaurant is operated as an integral part of a public building devoted to a public parking service." 365 U.S. at 724, 81 S.Ct. at 861. An "obvious fact" in the instant case is the operation of Temple, since the passage of the Act, as an "integral part" of a public system of educational institutions, the Commonwealth system of higher education, which performs an indisputable public service.

In view of these facts and circumstances—the "activities, obligations and responsibilities" of the Commonwealth, the "benefits mutually conferred" on Temple and the Commonwealth by their relationship, and the "obvious fact" that Temple is an "integral part" of the Commonwealth sytem of higher education—I find that the *Burton* criteria for "state action" have been satisfied. The language of Justice Clark's conclusion in *Burton* is, with appropriate substitutions, entirely apposite: The Commonwealth "has so far insinuated itself into a position of interdependence" with Temple "that it must be recognized as a joint participant in the challenged activity, which, on that account, cannot be considered to have been so 'purely private' as to fall without the scope of the Fourteenth Amendment." 365 U.S. at 725, 81 S.Ct. at 862.

In *Moose Lodge,* Mr. Justice Rehnquist, writing for the Court, noted that the question of whether "state action" exists "frequently admits of no easy answer." 407 U.S. at 172, 92 S.Ct. at 1971. Citing Reitman v. Mulkey, 378 U.S. 369, 378, 87 S.Ct. 1627, 1632, 18 L. Ed.2d 830 (1967), he said that to justify a finding of "state action" the State must have "significantly involved itself with invidious discriminations." 407 U.S. at 173, 92 S.Ct. at 1971. He characterized the relationship between the parking authority and the restaurant as "symbiotic," with benefits flowing from it to both lessor and lessee alike. *Id.* at 175, 92 S.Ct. at 1972. According to Mr. Justice Rehnquist, the regulatory process involved in *Moose Lodge* did not create such a "symbiotic relationship" between the state and social club that the former was "significantly involved with the invidious discriminations" of the latter. "Nor can it be said to make the State in any realistic sense a partner or even a joint venturer in the club's enterprise." Id. at 177, 92 S.Ct. at 1973. According to *Moose Lodge,* then, a finding of "state action" is proper when a state and private party enter into a "symbiotic relationship" conferring mutual benefits, a relationship sufficiently close that the state can be said, in a "realistic sense," to be the "partner" of the private party. Where such a partnership exists, the involvement of the state has reached the level of significance re-

quired by Reitman v. Mulkey, *supra,* and the activities of the private party are "state action."

The Temple-Commonwealth connection has surely reached that level of significance. Both parties derive substantial benefits from a relationship that they themselves have characterized as a "partnership." The criteria for "state action" announced in *Moose Lodge, supra,* have been satisfied.

### The Doctrine of Powe v. Miles

A recurrent theme in the cases where courts have concluded that the degree of a state's involvement with a formally "private" educational institution did not support a finding of "state action" was articulated in dictum by Judge Friendly in Powe v. Miles, *supra,* 407 F.2d at 81, where he said that "the state must be involved not simply with some activity of the institution alleged to have inflicted injury on a plaintiff but with the activity that caused the injury. Putting the point another way, the state action, not the private action, must be the subject of the complaint." [19]

I am not convinced that Judge Friendly's interpretation of *Burton, supra,* in this context is correct. There are certain factual situations where a state's involvement with a formally "private" educational institution is so significant that any activity of that institution or its officers may fairly be characterized as "state action." That, I submit, is the case with the relationship between Temple and The Commonwealth in the instant matter. By reason of Temple's statutory incorporation into the Commonwealth System of Higher Education, the substantial, though not controlling, representation of the Commonwealth on Temple's Board of Trustees, and the massive financial subsidies bestowed on Temple in order that it might provide relatively inexpensive higher education to residents of The Commonwealth,[20] Temple has become, in the precise words of the Temple University-Commonwealth Act, 24 P.S. § 2510-1 et seq., "an instrumentality of the Commonwealth." Consequently, there is no need to inquire whether officials of the Commonwealth have intervened, either directly or indirectly, in the formulation or implementation of Temple's faculty employment practices. For the purposes of this inquiry, all of Temple's actions, including its termination of plaintiffs' employment, merit classification under the rubric of "state action."

A factual situation analogous to the instant case was presented in Leslie v. Philadelphia 1976 Bicentennial Corporation, *supra,* and Judge Becker's thoughtful opinion there supports the result that I reach here. The defendants in *Leslie,* in arguing that their firing of one of their employees was not "state action," cited several factors that, in their view, demonstrated the private character of the corporation; it employed private counsel; it had entered into contractual relationships with the City of Philadelphia and the Commonwealth of Pennsylvania; the City of Philadelphia was not liable for the corporation's debts; the corporation had no power to tax; the private members of

---

19. See also, e. g., Robinson v. Davis, 447 F. 2d 753 (4th Cir. 1971); Blackburn v. Fisk University, 443 F.2d 121 (6th Cir. 1971); Brownley v. Gettysburg College, 338 F.Supp. 725 (M.D.Pa.1972); Counts v. Voorhees College, 312 F.Supp. 598 (D.S.C.1970).

20. It is not easy to determine with precision what quantum of financial aid by a state to a private educational institution will so involve the state in the affairs of the institution that all of the latter's activities will constitute "state action." In the instant case, where the state's financial aid is one-third of the institution's total annual income, where the amount of that aid exceeds forty million dollars a year, and where that aid has been furnished to the institution for a clear public purpose as defined by the Legislature which appropriates the public monies involved, that quantum may well have been reached. The record, however, reveals numerous other indicia of state involvement; they make it unnecessary for me to base my conclusion here solely on the amount of aid furnished by the Commonwealth to Temple.

its Board of Directors outnumbered the public members by a margin of 68 to 20; all of the executive positions on the Board were held by private members; and the corporation was managed in accordance with its charter and by-laws, not at the direction of the city or the state governments. 332 F.Supp. at 89.

These considerations failed to persuade Judge Becker. The corporation had been created as a "corporate instrumentality of the City of Philadelphia;" it was "[t]o receive, expend and account for funds" appropriated by various governments; its assets would revert to the City of Philadelphia after it had paid all its debts; it had been formed pursuant to an ordinance of the Philadelphia City Council; its articles of incorporation and by-laws required significant public representation on its Board of Directors; public funds provided the principal support for the enterprise; various governments would contribute land to the corporation; and the same governments had agreed to provide ancillary facilities and services, including transportation, for the corporation's projects. 332 F.Supp. at 92. In Judge Becker's view, these factors showed significant governmental input and "say" in the corporation's decision-making. *Id.* He concluded that the corporation was acting as a "surrogate of the state." *Id.* at 93. The *Powe* inquiry into the particular activity complained of was therefore unnecessary; whatever the corporation did was "state action." *Id.*

The parallels between the indices of state involvement in *Leslie* and those present in the instant case are striking. The only significant difference is the absence of a beneficial Commonwealth interest in Temple's assets.[21] Otherwise, the two situations are virtually identical. Temple is an instrumentality of the Commonwealth, and receives, expends and accounts for funds appropri-

ated by the Commonwealth; it owes its present status to a Commonwealth statute; that statute requires significant public representation on its Board of Trustees;[22] public funds are the principal source of Temple's general revenues, and supply a signficant portion of its total revenues; while the Commonwealth has not given any land to Temple, it has placed Commonwealth property at Temple's disposal and has constructed buildings for Temple's use. These indices of state involvement justify the conclusion that Temple is indeed a "surrogate of the state." As in *Leslie*, then, an inquiry into the Commonwealth's participation in the particular activity complained of is superfluous. All of Temple's actions are "state action."

### "State Action" In Housing and Hospitals

"State action" has been found to exist in a variety of situations where the degree of state involvement with a private party has not approached the level attained in the instant case. In the landlord-tenant area, for example, state enforcement of eviction procedures, coupled with a special zoning restriction, sufficed to justify a finding of state action in Lavoie v. Bigwood, 457 F.2d 7 (1st Cir. 1972). The same eviction procedures, when combined with federal funding of a housing project that was conditioned on state approval of the project, supported a similar finding in Joy v. Daniels, 479 F.2d 1236 (4th Cir. 1973). In McQueen v. Druker, 438 F.2d 781 (1st Cir. 1971), governmental subsidies for, and continuing state supervision of, a landlord's operations showed the presence of "state action."

The *McQueen* case is especially instructive. To be sure, it involved housing, not higher education, and relied heavily on a "public function" or "public purpose" theory which is not apposite here. Still, the parallels between the two

---

21. The Commonwealth does retain legal title to much of the land and many of the buildings that Temple presently uses.

22. The required public representation on Temple's Board (12 of 36) actually surpasses that on the Bicentennial Corporation's Board (20 of 88).

situations are striking. The Court noted that "[h]ere the landlords are, in return for an annual consideration, and subject to specific and continuing oversight, helping the state [to] realize its specific priority objective of providing for urban renewal displacees and its more general goal of providing good quality housing at rents which can be afforded by those of low and moderate income. The stronger posture of government supervision present in this case is not unrelated to the fact that the government has chosen to attract the participation of private persons in carrying out a specific governmental purpose." 438 F.2d at 784. Here Temple receives tens of millions of dollars in consideration, is subject to specific and continuing state supervision, and helps the Commonwealth to achieve its goal of providing relatively inexpensive higher education for Commonwealth residences. The Commonwealth has chosen to attract Temple's participation in carrying out "a specific governmental purpose," hence the "stronger posture of government supervision."

The *McQueen* court concluded that "when a specific governmental function is carried out by heavily subsidized private firms or individuals whose freedom of decision-making has, by contract and the reserved governmental power of continuing oversight, been circumscribed substantially more than that accorded an independent contractor, the coloration of state action fairly attaches." 438 F.2d at 784–785 (footnote omitted). In the instant case, Temple carries out a "specific governmental function"; it is "heavily subsidized"; and its "freedom of decision-making has . . . been circumscribed substantially more than that generally accorded to an independent contractor" by the trustee-appointment and financial accountability provisions of the Act. Hence, "the coloration of state action fairly attaches" to its activities.

In a number of cases involving hospitals that received federal funds, subject to state regulation, through the Hill-Burton Act, a finding of "state action" has been based solely on the receipt of Hill-Burton funding. Smith v. Hampton Training School for Nurses, 360 F.2d 577 (4th Cir. 1966); Simkins v. Moses H. Cone Memorial Hospital, 323 F.2d 959 (4th Cir. 1963); Meyer v. Massachusetts Eye and Ear Infirmary, 330 F. Supp. 1328 (D.Mass.1971); but see Ozlu v. Lock Haven Hospital, 369 F.Supp. 285 (M.D.Pa.1974). In other hospital cases, the coupling of Hill-Burton funding with governmental appointment of hospital officials has constituted the requisite "state action." Chiaffitelli v. Dettmer Hospital, Inc., 437 F.2d 429 (6th Cir. 1971); Meredith v. Allen County War Memorial Hospital Commission, 397 F.2d 33 (6th Cir. 1968). Both of these elements—governmental appointment of an institution's officials and receipt of governmental funds subject to state regulation—are present in the instant case. Indeed, a finding of "state action" is even more appropriate here, for Temple's subsidies flow directly from the Commonwealth, not the federal government.

The finding of "state action" in another hospital case, Eaton v. Grubbs, 329 F.2d 710 (4th Cir. 1964) (en banc), did not turn on the receipt of Hill-Burton funds, but it too supports the result reached here. Summarizing the state's involvement with the hospital in question, the late Chief Judge Sobeloff said: "we have a reverter supplemented by detailed regulations; the city and county have supplied construction funds for the expansion of the hospital plant; they continue to provide for its operational needs, grant it tax exemptions, empower it to condemn property and have supplied it with money to build on condemned land." 329 F.2d at 714–715. In this case, there is no reversionary interest in the Commonwealth, but that is because the Commonwealth still holds title to the many millions of dollars of real and personal property that it allows Temple to use; the Commonwealth has constructed millions of dollars worth of buildings for Temple; it appropriates

millions of dollars for Temple's operational needs; and it grants Temple not only a tax exemption but also the power to issue tax exempt bonds. To be sure, the Commonwealth has not authorized Temple to condemn property, but other indices of state involvement are present —the incorporation of Temple into the Commonwealth system of higher education, the renaming of the institution to reflect its changed status, and the power to appoint trustees that is vested in Commonwealth officials. Thus, the elements of state involvement present here so closely resemble those present in *Eaton, supra,* that they justify the same result. Judge Sobeloff concluded by saying that "[i]t is not suggested that each of the enumerated factors has independent potency to invoke the constitutional requirement. It is enough for present purposes to hold, as we do, that the record in its entirety leads to the conclusion that the hospital is performing the state's function and is the chosen implement of the state." 329 F.2d at 715. The same reasoning applies here. Though no single feature of the Commonwealth's relationship with Temple may suffice "to invoke the constitutional requirement," "the record in its entirety" demonstrates that Temple performs the state's function and is "the chosen instrument of the state." Temple is therefore bound by the restrictions of the Fourteenth Amendment.

### The Absence of "State Action" in Higher Education.

Defendants have referred the Court to a series of § 1983 cases which have, in the contexts of student discipline and faculty termination, examined relationships between states and institutions of higher education and have determined that "state action" did not exist. Wahba v. New York University, 492 F.2d 96 (2d Cir. 1974); Grafton v. Brooklyn Law School, *supra;* Robinson v. Davis, *supra;* Blackburn v. Fisk University,

*supra;* Browns v. Mitchell, 409 F.2d 593 (10th Cir. 1969); Powe v. Miles, *supra;* Pendrell v. Chatham College, 370 F.Supp. 494 (W.D.Pa.1974); Furumoto v. Lyman, 362 F.Supp. 1267 (N.D.Cal.1973); Brownley v. Gettysburg College, *supra;* Bright v. Isenbarger, 314 F.Supp. 1382 (N.D.Ind.1970); [23] Counts v. Voorhees College, *supra;* McLeod v. College of Artesia, 312 F.Supp. 498 (D.N.M.1970); Torres v. Puerto Rico Junior College, 298 F.Supp. 458 (D.P.R.1969); Grossner v. Trustees of Columbia University, *supra.* I have reviewed these cases with care and, in my view, each is distinguishable on its facts from the instant case because each dealt with significantly lesser degrees of state involvement. Indeed, in all of them, the oft-repeated statement that a state must be involved in the particular activity complaint of [24] is dictum only, for in none of these cases was there sufficient state involvement with any activity of the educational institutions in question to justify a threshold finding of "state action" with respect to the institution generally.

### The Argument From Antiquity.

Temple's arguments, while short on merit, have been long on history and ingenuity. The tears which Daniel Webster brought forth on behalf of Dartmouth College some 155 years ago are shed here again, for defendants have referred the Court to the ancient and justly acclaimed opinion of Chief Justice Marshall in Trustees of Dartmouth College v. Woodward, 17 U.S. (4 Wheat.) 518, 4 L.Ed. 629 (1819). As he closed his hours of oral argument, Mr. Webster, one of the most dramatic advocates ever to appear before the Court, purportedly "stood for some moments silent . . . while every eye was fixed intently upon him." Then he proceeded:

> " 'Sir, you may destroy this little institution; it is weak; it is in your hands! I know it is one of the lesser

---

23. This case did not involve a college or university, but rather a nonpublic secondary school.

24. See the discussion of the Powe v. Miles doctrine, supra.

lights in the literary horizon of our country. You may put it out. But if you do so, you must carry through your work! You must extinguish, one after another, all those great lights of science which, for more than a century, have thrown their radiance over our land!

" 'It is, sir, as I have said, a small college. And yet there are those who love it—' "

"His lips quivered; his firm cheeks trembled with emotion; his eyes were filled with tears, [and] his voice choked" as he concluded with a "few broken words of tenderness in which he went on to speak of his attachment to the college." 15 The Writings and Speeches of Daniel Webster, 11–12 (J. McIntyre ed. 1903).

Of course, there are alumni of Temple who love it as intently as Webster cherished Dartmouth, but the emotional tug of the *Dartmouth College* case is not a relevant legal rebuttal to the "state action" problem here. The mere chartering of a college by the state and the conveyance of real property from the state to the college does not make the college a public institution. That is the holding of the *Dartmouth College* case, and I do not quarrel with it. I simply do not believe that it controls this case. In the first place, the Court's decision long antedated passage of the Fourteenth Amendment; the phrase "state action" had not yet entered the vocabulary of American constitutional law. The instant case, moreover, is far different on its facts. By statutory enactment, the Pennsylvania Legislature has designated Temple "an instrumentality of the Commonwealth," in other words, a public, or at least quasi-public, institution. In the *Dartmouth College* case, the Vermont and New Hampshire legislatures did not reserve to state officials the right to appoint a specified number of Dartmouth's trustees, nor did they provide for continuing appropriations to Dartmouth from the states. If they had, the result in that case might well have been different. At one point in the opinion, Justice Marshall asked rhetorically: "Whence, then can be derived the idea, that Dartmouth College has become a public institution, and its trustees public officers, exercising powers conferred by the public for public objects? Not from the source whence its funds were drawn, for its foundation is purely private and eleemosynary . . ." 17 U.S. (4 Wheat.) at 635, 4 L.Ed. 629. The clear implication of this passage is that public funding, of the sort that Temple presently enjoys, would justify the characterization of Dartmouth as a "public institution."

### The Argument From Unrelated Pennsylvania Law.

Temple's brief spans the gap from the antiquity of the *Dartmouth College* case to the irrelevance of Pennsylvania state court cases where totally different issues were involved. I am convinced that neither Mooney v. Board of Trustees of Temple University, 448 Pa. 424, 292 A. 2d 395 (1972), nor Articles of Incorporation of Defender Association of Philadelphia, 453 Pa. 353, 307 A.2d 906 (1973) is apposite to the question presented by this case. In *Mooney,* the Court construed a Pennsylvania statute and held that, for purposes of that statute, Temple was not an "agency" of the Commonwealth of Pennsylvania.[25] It is clear that the Court in *Mooney,* while rendering an authoritative interpretation of Pennsylvania law, did not address itself to the relevant question of federal constitutional law, namely, whether Temple's activities can properly be classified as "state action" or action "under color of" state law. Nor does the decision of the Pennsylvania Supreme Court in *Articles of Incorporation* shed any more light on our present in-

---

25. One might note, parenthetically, that if Temple were an "agency" of the Commonwealth, it would be immune from suit under

§ 1983. Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961).

quiry. Using an appropriately limited standard of review, the Court held that a Common Pleas Court judge had not abused his discretion when he decided that proposed amendments to the association's articles of incorporation, amendments which gave the City of Philadelphia majority representation on the Association's Board of Directors, did not create such an inevitable conflict of interest for individual members of the association that the amendments violated the criteria for such amendments as set forth in Pennsylvania's Non-Profit Corporation Law. As in *Mooney*, the Court decided a precise question of state law; it did not claim to address itself to a question of federal constitutional law.

## CONCLUSION

The Higher Education Committee of the House of Representatives of the Commonwealth of Pennsylvania, in its 1965–1966 Report, said that the Temple-Commonwealth Act of 1965 had created an "organic relationship" between Temple and the Commonwealth identical in practical effect to the relationship between the Commonwealth and the Pennsylvania State University. "Both of these institutions, while private in corporate identity, are invested with a quasi-public character and charged with certain public responsibilities, obligations and commitments." (Report at 35.) Similarly, the then President of Temple, Paul R. Anderson, in "The Search for Balance," his report on Temple's affairs from 1967 to 1973, said that the Act had, "with uncanny foresight, retained for Temple something of its private character while at the same time giving it formal public status and responsibility." (Defendants' Motion, Affidavit of Marvin Wachman, Attachment 3.) On the basis of my reading of the extensive record in this case, I have concluded that the Commonwealth of Pennsylvania has so significantly involved itself in the affairs of Temple University that the latter's activities satisfy the requirements for "state action" and action "under color of" state law as set forth in Burton v. Wilmington Parking Authority, *supra*, and its progeny. As a result, one of the "public responsibilities" noted by both the Higher Education Committee and former President Anderson is a duty to comply with the commands of the Fourteenth Amendment in terminating the employment of its faculty members. This Court therefore has jurisdiction under 42 U.S.C. § 1983 (1970) to hear this cause of action. Defendants' Motion for Summary Judgment must be denied.