Patricia Chalfant **TRIVITS**, Plaintiff,

v.

The **WILMINGTON INSTITUTE**, a corporation of the State of Delaware, et al., Defendants.

Civ. A. No. 4776.

United States District Court,
D. Delaware.

June 23, 1976.

Alfred J. Lindh, Wilmington, Del., for plaintiff.

B. Wilson Redfearn and Jeffrey S. Goddess of Tybout & Redfearn, P.A., and Henry N. Herndon, Jr. and Jay Paul James of Morris, James, Hitchens & Williams, Wilmington, Del., for defendants.

## OPINION

LATCHUM, Chief Judge.

On February 16, 1972, Patricia Chalfant Trivits ("Trivits") was discharged (PX 14, 15, 16)[1] as Chief of the Book Processing Department of The Wilmington Institute ("Institute"), a free public library located in Wilmington, Delaware. On December 7, 1973 Trivits brought this civil rights action against the Institute and two of its officers in their official capacities, viz., Jack W. Bryant ("Bryant"), Director of the Institute and chief executive officer, and Edward B. duPont ("duPont"), president of the Board of Managers of the Institute. (Docket Item 1). Trivits' complaint,[2] based on 42 U.S.C. § 1983, alleged that she was wrongfully dismissed as an Institute employee because the defendants acting under color of state law had deprived her of liberty and property in violation of her substantive and procedural due process rights secured by the

---

1. PX refers to plaintiff's exhibits, DX to defendants' exhibits and Tr. to the trial transcript.

2. Jurisdiction exists by virtue of 28 U.S.C. §§ 1343(3) and (4).

Fourteenth Amendment.[3]  Trivits further alleged that her discharge had been maliciously motivated and that the defendants had circulated a letter to New Castle County officials which contained defamatory information concerning her competence, ability and desirability as an employee.  For these alleged injuries Trivits sought (1) reinstatement, (2) an injunction against defendants' communicating to others derogatory statements concerning her employment, (3) compensatory and punitive damages, and (4) suit costs and counsel fees. (Docket Item 1).  On July 11, 1974 the defendants consented (Docket Item 17) to plaintiff's filing an amended and supplemental complaint which had been filed previously on June 26, 1974.  (Docket Item 15). The amended and supplemental complaint added, as Count II, a state law claim of malicious defamation against the Institute and duPont based upon the publication of a letter written by duPont, under date of September 12, 1973, to the American Library Association ("ALA") which was printed in the February 1974 issue of the journal, *American Libraries.* (PX 42, pp. 90–94).  This Court on October 4, 1974 granted the defendants' motion to dismiss plaintiff's claim based on the EEOA, denied the dismissal motion with respect to the § 1983 claims and deferred ruling on the allegedly pendent state defamation claim until further facts could be developed regarding the § 1983 claims.  *Trivits v. Wilmington Institute, supra,* at 460–462.  The parties waived jury trial (Docket Item 57, par. 12) and the case proceeded to trial before the Court sitting without a jury on July 28–31, 1975.[4]

The claims remaining open for final disposition are those based on 42 U.S.C. § 1983 which allege a violation of Trivits' substantive and procedural due process rights and the state law claim of malicious defamation allegedly within the Court's pendent jurisdiction.  The background facts are as follows:

From September 30, 1968 until February 16, 1972 (pretrial order pars. 3–7;  Tr. 350–357), plaintiff worked in several capacities in the Institute's Book Processing Department.  On the latter date Bryant dismissed her from her post as Chief of the Book Processing Department.  (Tr. 357–360; PX 2 and 14).  Plaintiff contested her discharge at a specially convened "hearing" held on March 8, 1972 before a three-man Special Committee of the Institute's Board of Managers.  (Tr. 368–371, 679–690, 736–739, 775). The three Board members who comprised this Committee were (1) duPont, Chairman of the Board, who is employed by a local banking institution, (2) Richard J. Abrams, an attorney in private practice, and (3) J. Edgar Rhodes, a retired officer of a manufacturing company.  (Docket Item 31 attachment).  Bryant's decision was affirmed by the Special Committee on March 13, 1972.  (Tr. 691, 694).  Thereafter, Trivits sought relief from the ALA (Tr. 377) and that organization, after conducting a hearing in Wilmington (Tr. 740), published a report in the September 1973 issue of the journal, *American Libraries,* which was critical of the Institute's dismissal of Trivits.  (PX 18).  Shortly before publication of the report, Helen Barnett, Library Director of the Delaware Technical and Community College ("Delaware Tech") to whom Trivits had applied for a position as librarian, telephoned Bryant to inquire about Trivits' prior employment because Trivits had listed the Institute as a previous employer. (Tr. 232).  Bryant advised Barnett that Trivits had been discharged for cause.  (Tr.

---

3.  The complaint also alleged that the defendants, acting under color of state law and in violation of 42 U.S.C. § 1983, had deprived her of the right to equal protection of the laws guaranteed by the Fourteenth Amendment when she was dismissed because she was a woman and that her discharge based on her sex also violated the Equal Employment Opportunity Act ("EEOA"), 42 U.S.C. § 2000e–2(a)(1). The claim based on the EEOA was dismissed

by the Court in *Trivits v. Wilmington Institute,* 383 F.Supp. 457, 460 (D.Del.1974), and the claim based upon sex discrimination under 42 U.S.C. § 1983 was dismissed at the close of plaintiff's case midway through the third day of the bench trial.  (Tr. 531–532).

4.  Post trial briefing was not completed until February 5, 1976 and final oral argument was held on April 5, 1976.

233). However, Trivits was hired as assistant librarian at Delaware Tech after Barnett consulted with the ALA, which informed her of the results of its investigation. (Tr. 233, 242, 246). On August 31, 1973, Barnett's superiors briefly considered discharging Trivits as a result of the extensive local newspaper publicity in Wilmington concerning the aforementioned ALA investigation. (Tr. 200, 203–4, 230–1, 238–9). However, Delaware Tech did not dismiss Trivits. (Tr. 227, 239).

On September 12, 1973 duPont wrote a letter to the executive director of the ALA, replying to the published report and forwarded a copy to the editor of the *American Libraries.* (PX 26, 42). Unaware of the existence of duPont's reply letter, Trivits filed the instant suit on December 7, 1973 alleging that her dismissal, as previously indicated, was in violation of 42 U.S.C. §§ 1983 and 2000e. duPont's letter was subsequently published in the February 1974 issue of *American Libraries* and this prompted Trivits to amend her complaint in order to add the state defamation claim against duPont and the Institute based on the February 1974 publication of duPont's letter to the ALA. (Docket Items 15 and 17).

## I. § 1983 DUE PROCESS CLAIMS.

Having considered the testimonial and documentary evidence presented, the Court finds for the defendants on the § 1983 due process claims because the plaintiff failed to establish by a preponderance of the evidence that her dismissal by the Institute constituted action taken "under color of state law,"[5] that is "state action." *United States v. Price,* 383 U.S. 787, 794–5, n. 7, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966).

In order to determine whether a non-governmental entity has engaged in state action, the Court must carefully sift the facts and circumstances presented to it. *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 722, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). The most recent articulation of the state action test is found in *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), where the Supreme Court held that a state-regulated utility's summary termination of a customer's electric service was not state action, stating:

> " . . . the inquiry must be whether there is a sufficiently close nexus between the State and the challenged action of the . . . [private] entity so that the action of the latter may be fairly treated as that of the State itself." *Id.* at 351, 95 S.Ct. at 453.

*See also Broderick v. The Associated Hospital Service of Philadelphia,* 536 F.2d 1, at 4 (C.A. 3, 1976). Accordingly, this Court must examine the record developed in this case and trace the history of the Institute in order to identify the extent to which New Castle County and the City of Wilmington[6] were involved in the funding and operation of the Institute at the time Trivits was dismissed in February 1972 and the connection, if any, between such involvement and plaintiff's dismissal.

In 1857 the "Young Men's Association for Mutual Improvement of the City of Wilmington" received a corporate charter for the maintenance of a private subscription library (11 Del.Laws, Chap. 344); in 1859 the name of the private corporation was changed to "The Wilmington Institute" (11 Del.Laws, Chap. 516). After the passage of 19 Del.Laws, Chaps. 734, and 983 (1893), the Institute became a free public library "opened to the use of citizens of Wilmington," forfeiting its status as a private subscription library in exchange for an exemp-

---

**5.** 42 U.S.C. § 1983, reads in pertinent part: "Every person, who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . ."

**6.** The record conclusively shows that the State of Delaware has never had any connection with the funding or operation of the Institute. (Docket Item 31, pars. 6(d), 7(d) and 8(d)).

tion from property taxes[7] and annual appropriations from the City of five thousand dollars plus additional sums computed according to a formula based on the City's population. A further provision of the 1893 law required that the Mayor and five other City officials were to become *ex officio* members of the Institute's Board of Managers. However, the final section of this legislation expressly provided:

"That the managers of the said institute shall have power to make by-laws and rules for the government of the library and reading rooms."

Twenty-eight years later[8] in 1921, pursuant to yet another statute, the Institute agreed to transfer a tract of land having a value in excess of $200,000 located in downtown Wilmington to the City of Wilmington in exchange for $200,000, which it was then to combine with its privately endowed building fund of $300,000 in order to finance the construction of its main library. Under the terms of this statute (32 Del. Laws, Chap. 109), the Institute was authorized to retain possession of the land and main library building so long as a free public library was maintained on the premises.[9] The library property was finally deeded in fee to the City on March 23, 1923 and the City in return granted a perpetual lease of the building back to the Institute with the right of management being held by the Institute. (Docket Item 31, par. 2). At about the same time the City also by indenture recognized that ownership of all books and documents housed in the library belonged to the Institute. (Docket Item 31, par. 29).

The Institute's involvement in providing free library services to New Castle County residents who live outside of Wilmington is the outgrowth of a series of later legislative enactments. Pursuant to 36 Del.Laws, Chap. 112 (1929), the New Castle County Levy Court, the then governing body of the County, was authorized to appropriate as much as $10,000 annually for the maintenance and support of a free public library for the use of non-residents of Wilmington and the Institute was empowered to operate the County library using such funds. Apparently, the County library system was first established by opening the City library to County residents and by the distribution of books in the County to schools and through the use of traveling bookmobiles. As the population of the County grew, the maximum appropriations for the County library system necessarily increased[10] until 1967, when the New Castle County Council (successor to the Levy Court) was authorized to appropriate an unlimited amount of money for the "maintenance and support of free public libraries," 56 Del.Laws, Chap. 23.[11] Also, beginning in 1963, legislation was enacted enabling New Castle County "[to] construct and equip free public libraries" at two locations outside of Wilmington and then to enter into contracts with the Institute to operate these libraries. 54 Del. Laws, Chap. 210, § 1.[12]

While the Institute's library service obligations to the public expanded between

---

**7.** This exemption is today codified in 9 Del.C. § 8104 and is enjoyed by over seventy-five other organizations.

**8.** Between 1893 and 1921 the following legislation pertaining to the Institute was enacted. 22 Del.Laws, Chap. 360 (1905) authorized the City of Wilmington to contract with the Institute to provide unlimited annual appropriations; 25 Del.Laws, Chap. 105 (1909) raised the minimum annual appropriation which the City was required to provide the Institute.

**9.** Companion legislation (32 Del.Laws, Chap. 110) expanded the number of City officials who were to serve *ex officio* on the Board of Managers from 5 to 8 specifying, however, that 10 other persons were to be elected to the Board of Managers by the stockholders of the Institute.

**10.** To $20,000 in 1937 (41 Del.Laws, Chap. 109); to $30,000 in 1945 (45 Del.Laws, Chap. 107); to $40,000 in 1949 (47 Del.Laws, Chap. 79); to $75,000 in 1953 (49 Del.Laws, Chap. 95); to $125,000 in 1957 (51 Del.Laws, Chap. 19); to $175,000 in 1960 (52 Del.Laws, Chap. 250); and to $300,000 in 1963 (54 Del.Laws, Chap. 146).

**11.** Codified in 9 Del.C. § 1562(a)–(c).

**12.** Codified in 9 Del.C. § 1562(d).

1920 and the early 1970's through the influx of greater amounts of public funding, first from the City and then from the County, the active management of the Institute's operations was retained by the self-perpetuating Board of Managers, a majority of whom were and are private citizens.[13] Henry R. Folsom, Jr., County Councilman from 1967 until 1973 and President of County Council at the time of trial (Tr. 288–9), testified that during these years at "budget time," the County Council would invariably ask the Institute for some explanation as to whether the funds slated for appropriation were to be used for the purchase of books or for salaries. (Tr. 292, 303). He also testified that the County Council did not attempt to control the expenditure of the funds thus appropriated (Tr. 301–2),[14] and emphatically denied that the New Castle County government was involved or even concerned about the daily operation of the Institute, including the hiring, firing or promotion of employees and administrators. (Tr. 290, 301, 302). County appropriations for calendar year 1972 were $416,000 (Docket Item 31, par. 6(c)) and City appropriations for fiscal year 1971–1972 totaled $537,000 (PX 41), but other than these large sums of money routinely granted to the Institute [15] there is no other evidence of external governmental supervision over the Institute's Board of Managers or its Director. There is also a lack of evidence

concerning the involvement of the *ex officio* members of the Board of Managers who are City or County officials (Tr. 732, 677–8),[16] and it is clear that the convening of the Special Committee, comprised of three non-governmental Board members, was primarily, if not exclusively, the decision of duPont and Abrams. (Tr. 679–680, 695, 733; Docket Item 35 at p. 3).

Based on the foregoing facts, the Court must conclude that plaintiff's dismissal was not the result of "state action." While the City of Wilmington and New Castle County through their substantial grants of funds to the Institute have fostered its continued growth, it is the teaching of *Jackson v. Metropolitan Edison Co., supra* at 381–384, 95 S.Ct. 449, that mere governmental financial involvement in a "public function" or in "businesses affected with a public interest" is insufficient to predicate a finding of state action. *See also Ozlu v. Lock Haven Hospital,* 369 F.Supp. 285 (M.D.Pa.1974), *aff'd,* 511 F.2d 1395 (C.A. 3, 1975); *Antinoro v. Wilmington Medical Center, Inc.,* C.A. No. 74–162 (D.Del., Dec. 19, 1975). *See Magill v. Avonworth Baseball Conference,* 516 F.2d 1328, 1334 (C.A. 3, 1975). *Jackson* demands the existence of a nexus between governmental involvement and the challenged action of the non-governmental entity, and it is clear here that at least until 1974,[17] neither the

13. The Board of Managers consists of ten self-perpetuating non-governmental members and eight *ex officio* governmental members.

14. Beginning with fiscal year 1973 (July 1, 1973–June 30, 1974), the Institute and New Castle County entered into a formal written agreement (PX 36) breaking down into nine discrete categories the uses to which the money appropriated by the County was to be put. The agreement refers to the fact that the County was slated to receive federal "entitlement funds" under the State and Local Fiscal Assistance Act of 1972, 31 U.S.C. § 1221 et seq. These federal funds, to the extent received up to $481,581, were to be paid to the Institute for the operation of the two County libraries located outside of Wilmington. The Court is of the opinion that this formalization of the Institute's status as the operator of the County's library system was prompted by administrative provisions of federal law, 31 U.S.C. §§ 1241–1243,

and in no way rendered dubious Folsom's uncontradicted testimony (Tr. 290) concerning the period between 1967 and 1973, the years in question.

15. The Institute also receives investment income from its private endowment as well as gifts from private donors.

16. In 1958, the President of the New Castle County Levy Court (later New Castle County Executive) was made an *ex officio* member of the Board to replace one of the *ex officio* City members. 51 Del.Laws, Chap. 342.

17. Apparently as of July 1, 1975, New Castle County began to operate on its own the two libraries located in the County outside of Wilmington (Tr. 290, 292–4, 296), and was reconsidering the scope of its financial commitments to compensate the Institute for services the latter performed for County residents who uti-

City of Wilmington nor New Castle County probed into the Institute's budgetary needs or fiscal administration, or meddled in its overall management, let alone into its employment practices.

Also absent between the Institute and either Wilmington or New Castle County is the symbiotic *quid pro quo* relationship found in *Burton v. Wilmington Parking Authority, supra.* There, the very financial viability and profitability of the City's parking authority garage depended upon the racially segregated practices of the lessee-restaurant located in public parking facilities, since the Supreme Court acknowledged that requiring the restaurant to serve negroes would injure the restaurant's business and in turn jeopardize the financial success of the entire parking authority operation. See 365 U.S. at 720, 723–724, 81 S.Ct. 856. *Isaacs v. Board of Trustees of Temple University,* 385 F.Supp. 473 (E.D.Pa.1974), is a recent case finding the existence of a *Burton*-like *quid pro quo* symbiotic relationship between the Commonwealth of Pennsylvania and an otherwise private educational institution so as to render the dismissal of two of its professors' "state action." The Court found in that case that in 1966 the Commonwealth and Temple had entered into a very close arrangement for their "mutual benefit." The Commonwealth by formal legislative act intruded into the management of Temple by reorganizing the Board of Directors and by infusing massive financial assistance into Temple's budget and building fund so as to promote the rapid expansion of the student body in order to meet as quickly and economically as possible the Commonwealth's perceived duty to provide higher education for eligible Pennsylvanians of moderate means. 385 F.Supp. at 476, 478–479, 481–482. This *quid pro quo* relationship between Temple and the Commonwealth, which also entailed some regulation of the faculty "teaching load," *id.* at 481, 483, continued unabated at

the time the plaintiff professors were dismissed from their posts. *See also Braden v. University of Pittsburgh,* 392 F.Supp. 118 (W.D.Pa.1975), on remand from 477 F.2d 1 (C.A. 3, 1973), for a description of a similar relationship between the Commonwealth and a formerly private university.

■ In contrast to the *Burton, Isaacs* and *Braden* cases, all that the record in this action shows is that financial involvement of the City and County with the Institute was more in the nature of a dole that gradually and steadily increased over the years. Plaintiff has failed to show that this public funding was in any way motivated by the City's and County's belief that it would be less expensive to support a privately run library, which might be able to operate on a lower salary scale and with fewer employee benefits than either governmental body would be required to spend to operate a library or libraries directly, i. e., on their own and in their own facilities. In conclusion, on the present record, the Court finds that no symbiotic *quid pro quo* relationship existed between the Institute, the City of Wilmington or New Castle County at the time plaintiff was discharged. *See Broderick v. The Associated Hospital Service of Philadelphia, supra,* at 6–8.

Since the record fails to reveal the state action demanded for the successful prosecution of a § 1983 suit, plaintiff has failed to prove her federal cause of action, and the Court will dismiss Count I of the amended and supplemental complaint, i. e., all of plaintiff's due process of law claims based on 42 U.S.C. § 1983.[18]

## II. ALLEGED PENDENT STATE LAW CLAIM.

As mentioned above, in October 1974 this Court deferred ruling on the motion to dismiss the alleged pendent state defamation claim until further facts could be developed

lized the Institute's main library in Wilmington. (Tr. 296, 282–285).

**18.** Of course, the Court is not making a blanket determination that every possible action of the

Institute, *e. g.,* discrimination against library users on the basis of religion, race or sex, would not be state action subject to the Fourteenth Amendment.

regarding the § 1983 claims. At that time, because of the confusing language of the original and supplemental complaints, it was unclear whether or not duPont's allegedly defamatory letter to the ALA was a continuation of the injury purportedly sustained by plaintiff due to the violation of her "liberty" interest arising out of her wrongful dismissal. Prior to trial, the Court had interpreted the allegations of the complaint and amended and supplemental complaint as possibly alleging a malicious vendetta against plaintiff which commenced with her discharge in February 1972 and was continued by the publication of duPont's letter in February 1974 in *American Libraries.* Having so read the complaints, the Court tentatively concluded that it possibly had pendent jurisdiction to hear the state claim pursuant to *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

### 1. *Plaintiff's Liberty Claim*

It now appears that the "defamatory letter" circulated to New Castle County officials regarding her discharge and referred to in the complaint was actually two letters. The first was a cover letter dated March 14, 1972 from Bryant to William Conner, then New Castle County Executive (PX 20), written in reply to Conner's letter of March 8 (PX 19), in which Conner had requested to be informed of the outcome of Trivits' hearing before the Special Committee of the Board of Managers. In this earlier letter, Conner had written that two members of the County Council had approached him indicating that Trivits' impending termination had been brought to their attention and that they were concerned about "the inequities in this matter." Bryant's reply letter (PX 20) described the mechanics of the hearing before the Special Committee and referred Conner to an enclosed copy of duPont's letter to Trivits' attorney (see PX 26) for a statement of the substantive reasons underlying the Special Committee's decision to uphold Bryant's dismissal of the plaintiff. Bryant also added the caveat that the copy of duPont's letter to Trivits' counsel was for Conner's personal informa-

tion "and that of other legislators to whom you refer, if you think that desirable." Clearly, any deprivation of liberty interest implicated by these letters was instigated in the first instance by plaintiff's protest to two County Councilmen (Tr. 299, 305), and while this fact alone would not bar a recovery on the liberty claim, see *Morris v. Board of Education of Laurel School District,* 401 F.Supp. 188, 211 (D.Del.1975), it does bear on the harm, if any, which befell plaintiff as a result of Bryant's correspondence with Conner and the County Councilmen. Thus, the *operative fact* underlying this first aspect of the liberty claim was how Conner and the two Councilmen reacted to Bryant's explanation of plaintiff's discharge. The second aspect of Trivits' liberty claim is based upon Bryant's brief conversation with Mrs. Barnett at Delaware Tech and the operative fact here is the extent to which her career advancement at Delaware Tech has been damaged by her dismissal from the Wilmington Institute.

### 2. *State Defamation Claim*

On the other hand, the state defamation claim asserted in Count II of the amended and supplemental complaint involves other facts totally unrelated to the liberty claims discussed above. duPont's letter to the ALA, published in the *American Libraries,* was in response to the September 1973 publication of a Report of the Staff Committee on Mediation, Arbitration and Inquiry of the ALA ("SCMAI") on plaintiff's prior filed "Request for Action." (PX 42). The SCMAI Report, while noting that plaintiff had been dismissed for unsatisfactory work and that Bryant had suggested to a member of SCMAI that she was insubordinate and incompetent, focused primarily on the lack of an identifiable administrative hierarchy within the Institute, the absence of a table of organization and clear cut chain of command, and deficiencies in communications between administrators and staff. The Report also dealt with the relationship of the Institute with the City of Wilmington and New Castle County, describing it as one in which the Institute received substan-

tial public funding without having to account for its expenditures and without having to provide its employees the job security ordinarily afforded public employees. A reading of the Report leaves one with the definite impression that SCMAI viewed plaintiff's grievances as symptomatic of serious deficiencies in the Institute's operation as a professional library, and it is this impression that duPont's reply letter to ALA and *American Libraries* sought to dispel. duPont contended that Trivits had received warning of the unsatisfactory nature of her job performance. In addition, duPont controverted SCMAI's description of the Institute's structure and relationship with the City and County. Thus, despite plaintiff's characterization of portions of duPont's reply as false, unprovoked and unjustified, the overall tone of duPont's reply is evidence of an attempt to portray Trivits' dismissal as a routine management decision fairly determined by a well-run professional library. Consequently, plaintiff's ability to recover on the state defamation claim depends upon establishing that a few statements concerning her in a lengthy letter were published with the intent to injure the plaintiff's character, fame, reputation, or professional standing by false and malicious statements. Furthermore, other facts would have to be adduced by the plaintiff in order to rebut a qualified claim of privilege asserted by the defendants which is recognized by Delaware law, viz., the privilege of an employer to comment to a third party concerning the performance of his former employee,[19] and an additional privilege not heretofore explicitly recognized in Delaware, but recognized in many other jurisdictions, the privilege afforded for defensive declarations or declarations made in the course of controversy.[20]

It is clear that the evidence which the plaintiff has to explore in pursuing her state defamation claim is much broader in scope than that relating to her liberty claim, entails an examination of the defendants' actions taken long after her dismissal, and is only remotely related to the caliber of her performance as Chief of the Processing Department. In essence, the nucleus of operative facts underlying plaintiff's state defamation claim is not the same as those underlying her liberty claim, a distinction this Court was unable to glean from a pretrial reading of plaintiff's complaint and amended and supplemental complaint.

The upshot of the matter is that this Court is without the constitutional power to hear the state defamation claim under its pendent jurisdiction. Although trial has already been held, it is plausible to read *Gibbs, supra,* as teaching that while the question of power to hear a pendent claim ordinarily will be resolved on the pleadings, the question remains open throughout the litigation. See 383 U.S. at 727, 86 S.Ct. 1130. In *PAAC v. Rizzo,* 502 F.2d 306, 312–313 (C.A. 3, 1974), the Third Circuit so interpreted *Gibbs,* holding, on review of a final judgment [21] after a non-jury trial, that the district court was without power to hear a state law claim in the first instance. Plaintiffs in the *PAAC* case had challenged as illegal under federal law Mayor Rizzo's interference with their employment in an anti-poverty program and had appended a defamation claim under Pennsylvania law. The Court of Appeals found that the defamation claim was factually distinct from the federal claim involving the Mayor's interference with the operations of PAAC, leading it to conclude that the state defamation claim did not arise from the nucleus of operative fact common to the federal claims and was not one which "we would 'ordinarily expect' to be tried with the federal claims." *Id.* at 313. Likewise, in the instant case, Trivits' § 1983 liberty claim focused on many facts irrelevant to her state defamation claim and since the al-

---

**19.** *Burr v. Atlantic Aviation Corp.,* 332 A.2d 154 (Del.Super., 1974), *rev'd on other grounds,* 348 A.2d 179 (Del.Supr.1975).

**20.** 41 A.L.R.2d 1083; 50 Am.Jur.2d pp. 721–723.

**21.** See 502 F.2d at 309; 363 F.Supp. 503 at 505, 510.

leged defamation occurred by the publication of duPont's letter in February 1974, some twenty-three months after her discharge and in response to an investigation by the ALA which plaintiff had initiated, the Court is unable to conclude that the plaintiff would ordinarily have been expected to try the defamation claim with the § 1983 liberty and property claims. *See also Ryan v. New Castle County,* 365 F.Supp. 124, 127 (D.Del.1973).

However, even assuming that the Court has the constitutional power to hear the state defamation claim it retains discretion after trial not to exercise that power. *Gibbs,* 383 U.S. at 726–727, 86 S.Ct. 1130; 13 Fed.Prac. & Proc. (Wright & Miller) at 455. One factor militating against retention of pendent jurisdiction later in the proceedings is the discovery that the state law claim predominates, for example, due to the obvious inability of the plaintiff to establish a federal claim from the evidence adduced. *Gibbs,* 383 U.S. at 727–728, 86 S.Ct. at 1139–1140;[22] *Mayor v. Educational Equality League,* 415 U.S. 605, 607 n. 23, 94 S.Ct. 1323, 39 L.Ed.2d 630 (1974). Another maxim expressed in *Gibbs* is that "needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." 383 U.S. at 726, 86 S.Ct. at 1139; *State of Delaware v. Pennsylvania, New York Central Transportation Co.,* 323 F.Supp. 487, 497 (D.Del.1971).

Application of these two factors to the present case constrains this Court in the exercise of its discretion to dismiss the state defamation claim. *Gibbs* places the onus on the plaintiff to maintain a viable federal claim throughout the litigation at the risk of dismissal of the state claim. Although warned in the pre-trial stages of this case that she would have to establish "state action" to have a viable due process and equal

protection claim under § 1983, the plaintiff has failed to prove this indispensable ingredient to support her federal claims. Furthermore, the state defamation claim raises many questions concerning qualified privileges under Delaware law which in the interest of comity should be interpreted by the state courts.

Accordingly, the Court concludes that for two reasons, viz., (1) the lack of constitutional power, (2) and assuming power, as a matter of discretion, Count II of the amended and supplemental complaint should be dismissed.

The above shall constitute the findings of fact and conclusions of law as required by Rule 52(a), F.R.Civ.P.

An order will be entered in accordance with this opinion.

---

22. " . . . [e]ven the trial itself may reveal a substantial hegemony of state law claims . . which could not have been anticipated at the pleading stage . . . [d]ismissal of the state claim might then be merited. For example, it may appear that the plaintiff was well aware of the nature of his proofs and the relative importance of his claims; . . . Once it appears that a state claim constitutes the real body of the case, to which the federal claim is only an appendage, the state claim may fairly be dismissed."