471 F.Supp. 912 (1979)
William J. GILBREATH, Plaintiff,
v.
EAST ARKANSAS PLANNING AND DEVELOPMENT DISTRICT, INC., a corporation, Delores Harrelson, Frank Dean, James E. Sloan, Jack Brawley, Emmett Smith, J. D. Blankenship, Jess E. Porter and Clifton Brown, Defendants.
No. J-75-C-123.
United States District Court, E. D. Arkansas, Jonesboro Division.
May 24, 1979.
*913 *914 E. J. Butler, Butler, Hicky & Jones, Forrest City, Ark., for plaintiff.
Berl S. Smith, Barrett, Wheatley, Smith & Deacon, Jonesboro, Ark., for defendants.
ROY, District Judge.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
In this action, which was tried to the court sitting without a jury on March 12, 1979, the plaintiff, William J. Gilbreath, challenges the constitutional propriety of the termination of his employment with the East Arkansas Planning and Development District. The following findings of fact and conclusions of law are submitted as the court's memorandum of decision in accordance with the provisions of Rule 52(a) of the Federal Rules of Civil Procedure.

I.

FINDINGS OF FACT
1. The plaintiff's complaint and amended complaint state a claim for relief cognizable under the provisions of 28 U.S.C. § 1331(a), 42 U.S.C. § 1983 and 28 U.S.C. § 1343(3) & (4). Accordingly, the court finds that it has jurisdiction over the subject matter of this action and the parties pursuant to the aforementioned statutory provisions.
2. The plaintiff has offered no evidence which would sustain this court's jurisdiction under 42 U.S.C. § 2000d. Nor has the plaintiff offered any evidence to substantiate allegations that he was discriminated against on the basis of his sex. The court, therefore, finds that these allegations, and the invocation of this court's jurisdiction pursuant thereto, are devoid of substance or merit.
3. The plaintiff herein, William J. Gilbreath, is a 53 year old white male with a college education. He is a resident of the State of Arkansas and has lived in Forrest City, Arkansas for the past 50 years. For twelve years prior to his employment with the East Arkansas Planning and Development District, the plaintiff was employed as a fishery biologist with the Arkansas State Game and Fish Commission.
4. The plaintiff was employed by the East Arkansas Planning and Development District in July of 1970. His initial position was as a member of the staff in the District's Comprehensive Health Planning Division. His starting salary in his original position with the District was approximately $14,000 per year. The plaintiff was Director of Comprehensive Health Planning when his employment was terminated on May 21, 1975. His annual salary as Director of Comprehensive Health Planning was slightly in excess of $15,000 per year. The plaintiff learned of a job vacancy at the East Arkansas Planning and Development District through Henry Jones, a former administrator with the District.
*915 5. East Arkansas Planning and Development District, hereinafter referred to as "the District", is a nonprofit corporation organized pursuant to the provisions of Ark.Stat.Ann. §§ 64-1901, et seq. and Ark. Stat.Ann. §§ 9-324, et seq. The District is the successor corporation of the now defunct Northeast Arkansas Economic Development District. The District researches, develops, plans and coordinates programs designed to enhance the economic development of the twelve county region it serves. Comprehensive health planning is among the various public interest projects which have been undertaken by the District. The geographic region served by the District includes the following counties in northern and eastern Arkansas; Randolph, Clay, Lawrence, Greene, Craighead, Mississippi, Poinsett, Cross, Crittenden, St. Francis, Lee and Phillips. Most, if not all, of the District's projects are developed in cooperation with, and sometimes under the scrutiny of, various state and federal agencies such as HEW, EDA and the different offices within Arkansas' Department of Social and Rehabilitative Services. The District's activities are primarily funded through grants from the federal, state and local governments. The federal government is by far the largest single source of the District's operating revenues. Federal funds provide approximately 75% of the District's operating capital.
6. East Arkansas Planning and Development District is governed by a board of directors. Elected county and municipal officials comprise a majority of the membership on the board of directors. The remaining positions on the board of directors are filled by designees of elected officials and by other laymen. A number of positions on the board of directors are reserved for members of minority groups. The daily business of the District is supervised by the Executive Director of the District. Below the Executive Director in the chain of command are the Directors in charge of overall performance in specific areas of responsibility such as planning or finance and administration. Next in terms of authority in the District's organizational structure are the directors of the different planning divisions within the District.
7. At the time of the termination of the plaintiff's employment with the District, defendant Delores Harrelson, whose first name is correctly spelled "Dolores", was Executive Director of East Arkansas Planning and Development District. Defendant Frank Dean was President of the District. The remaining individually named defendants were members of the District's Board of Directors who affirmatively consented to the termination of the plaintiff's employment with the District.
8. William J. Gilbreath was initially employed by East Arkansas Planning and Development District in July of 1970. His employment with the District was terminated on May 21, 1975. Although the plaintiff requested a complete written statement of the reasons for his discharge, he was never provided with a written list of reasons for the termination of his employment with the District. Nor was the plaintiff accorded a hearing either prior to or after his termination despite requests for a hearing from the District's Health Advisory Council as well as from the plaintiff himself.
9. The plaintiff was given an opportunity to resign from his position with the District but the plaintiff declined to resign. He was terminated the day after the request for his resignation. The resignation request was made by letter from defendant Harrelson. The resignation request, which was hand delivered and placed on the plaintiff's desk on May 21, 1975, informed the plaintiff that his employment would be terminated if he did not resign.
10. The plaintiff did not have a written contract of employment with the District. The only contract of employment between the plaintiff and the District was oral. There is no Arkansas law which grants tenure to a person holding the same position that the plaintiff occupied with the East Arkansas Planning and Development District. Nothing in the personnel policies and regulations of East Arkansas Planning and Development District can be construed as *916 creating an expectation of continued employment with the District.
11. The plaintiff was not totally without notice of deficiencies in his job performance prior to his termination on May 21, 1975. On May 6, 1975 the plaintiff met with defendant Harrelson, the Executive Director of East Arkansas Planning and Development District, at which time the plaintiff was informed that his job performance would have to be improved in certain areas. The plaintiff was also informed, on more than one occasion prior to his termination, that he would have to communicate with his superiors, that he would have to establish daily priorities to insure that his assigned work was completed in a satisfactory manner and that he would have to conform to established District policies with respect to work progress reports, claims for travel expenses and work on grant renewal applications for various projects.
12. The plaintiff contends that the real reason for his discharge was because of his exercise of his First Amendment right of freedom of speech. More specifically, the plaintiff contends he was fired because he disagreed with the District's position as to the number of health planning districts which the Governor should designate in the State of Arkansas. After the passage of the National Health Planning and Resources Development Act of 1974 the Governor of the State of Arkansas sent a letter to East Arkansas Planning and Development District requesting the District's recommendation with respect to the number of health planning districts which should be designated in the State. The District's response, which was conveyed by a letter from defendant Frank Dean dated February 28, 1975, favored retention of the State's existing eight health services areas. As a less desirable alternative, the District suggested that the number of health services areas in the State be reduced to four. The plaintiff apparently disagreed with the District's position, preferring one statewide health planning district or region as opposed to the eight districts or areas suggested by the District. The defendants contend that the plaintiff's disagreement with the District's position on this issue was not the cause of the plaintiff's termination. To the contrary, the defendants contend that the plaintiff was terminated only after it became apparent from a cumulative series of events that plaintiff either could not or would not perform his assigned responsibilities in accordance with the level of performance expected by the District. The defendants contend that the plaintiff's termination was caused by his failure to recognize or accept the authority of his superiors, his lack of cooperation and communication with those in supervisory capacities on matters affecting the vital interests of the District and his persistent refusal to conform to the established operating policies and procedures of East Arkansas Planning and Development District.
13. After considering the testimony of all of the witnesses, including the plaintiff, and observing their demeanor on the witness stand, the court must conclude that the plaintiff's credibility is seriously deficient. The following examples adequately support the court's conclusion in this regard. During cross examination the plaintiff was asked about the circumstances of the termination of his employment with the Arkansas State Game and Fish Commission. The plaintiff's response was that he "voluntarily resigned" from his position with the Game and Fish Commission. The plaintiff steadfastly maintained that he voluntarily resigned throughout his testimony on this issue despite the contents of defendant's exhibit number one. Defendant's exhibit number one is a letter, dated May 26, 1970, from Andrew H. Hulsey, Director of the Arkansas State Game and Fish Commission, to Mr. Gilbreath. The letter provides as follows:
"Dear Mr. Gilbreath:
Following your appearance before the Arkansas State Game and Fish Commission, meeting in executive session Tuesday afternoon, May 19, 1970, I was instructed by the Commission to provide you with a written list of charges that I made against you.

*917 The charges against you are (1) generally unsatisfactory performance; (2) your refusal to accept the authority of your Chief; and (3) your refusal to follow the chain of command. Specific items include but are not limited to those listed below:
1. Refusal to follow routine policy on buying and billing.
A. Bills properly made out to the Arkansas Game and Fish Commission, legible, dated and itemized.
B. Bills promptly submitted with a written statement of what purchase was made, why it was made, and where and how it is being used.
C. Long and continuous refusal to properly make out gasoline purchase tickets and submit Monthly Vehicle Utilization reports on time.
D. The submission of bills for items that covered purchases of a personal nature or that would have required prior approval before purchase could have been made.
2. Frequent failure to properly submit Monthly Travel Expense Account.
3. Frequent failure to submit Weekly Activity Report on time.
4. Frequent failure to submit Monthly Summary of work accomplished on time for inclusion in the Division's Monthly Activity Report to the Commission.
5. Frequent failure to submit Fish Population Sample Reports in time for the information to be of use in our fish management work for that particular season.
6. Frequent failure to submit Shoreline Seining Reports in time for the stocking of June bass.
7. Frequent failure to promptly carry out assigned extension work and promptly follow through with a written report with copies to the private landowner as well as the Fisheries Headquarters Office.
8. Almost continual refusal to follow the policy on extension work that all such requests must go through the Fisheries Headquarters Office before work is done.
9. Frequent failure to run requests for salvaged fish through the Fisheries Headquarters Office for prior approval.
10. Frequent failure to report for work assignments on time and staying until the work was completed. This includes meetings, symposia, etc.
11. In recent years, complete refusal to attend out-of state Scientific meetings.
12. Complete lack of authorship of any management or research papers at Scientific meetings.
13. Failure to submit news items for publication to our I. & E. Division.
14. Failure to submit Administrative reports without long and continuous urging,sometimes lasting for several years when two or three months would have been a realistic time lag.
15. Failure to provide fish specimens assigned for the movie, "Arkansas Fishes" (yellow bass).
16. Failure to make assigned appearances on Educational TV.
17. Failure to utilize camera, projector and screen and to make talks to civic groups, sportsmen's groups, et al., to help sell Arkansas' Fish Management program.
18. Failure to install Old Town Lake water gauge until threatened with discharge by the Commission itself.
19. Failure to properly carry out a fish population sample on L'Anguilla River.
20. Failure to report inventory items in your possession after repeated written inquiries from the Fisheries Headquarters Office to all employees in an attempt to locate these items.
21. Failure to follow established policy that Fisheries Division employees do not deal directly with the Little Rock Office or any of the departments housed in Little Rock unless specifically directed to by the Chief of the Fisheries Division.

*918 22. Continuous attempts to deal directly with the Director and the Commissioners.
23. Failure to come properly equipped when assigned work such as the draining of the Lake Conway Nursery Pond.
24. Attending a Law Course in 1969 in Little Rockdriving back and forth in the State vehicleusing as a guise the work on the Maumelle Nursery Pond; this without knowledge of or approval of your Chief.
25. Refusal to accept the authority of the Chief of the Fisheries Division on routine fish management work carried out according to accepted fish management techniques. As a result, no public lakes have been renovated in your District and about the only shad kills done were forced upon you, your excuse being that you did not agree with this type of management; however you were hired by the Commission to do fish management work under the direction of the Chief of the Fisheries Division.
26. About the only recommendations the Chief of the Fisheries Division ever receives from you for fish management in your District involves the expenditure of large sums of money or are not feasible due to the inability of our hatcheries to produce the size and quality of fish stocks you recommend. A professional biologist should devise ways to accomplish the end result within the resources available.
27. Failure to take orders and directives seriouslysuch as removing the decals off the door of your pickup truck and bringing in tires for survey which did not come off the State vehicle. This caused us to have to spray yellow paint on the piles of old tires at Lonoke which we accumulate for burning trees and brush on our construction projects.
28. Flagrant and continuous violation of the policy that a fishery biologist does not go outside his District without first obtaining approval from the Chief of Fisheries. You are always doing this; however, no reports come to the Fisheries Division office to substantiate these travels as official business.
29. Over a long period of years the various deficiencies noted in your attitude towards your job, your Chief and your general work performance have caused your superiors and peers to lose confidence in you. Therefore, you have become a liability to this organization.
30. Your recent campaign to gather political support to circumvent a move to Little Rock demonstrated to me that you are "lost" as far as this organization is concerned. Your activity demonstrated for all to see that you did not ever intend to accept the authority of your Chief and/or your Director. It is your own statement that you are satisfied with and want to work with the Commission per se. In addition to wanting to work directly with the Commission per se, thereby by-passing your Chief and Director, you attempted to build yourself up in their eyes by tearing someone else down.
For the past several years I have pleaded with you to do your work, turn in your reports and follow routine policy and procedure. For some reason you have always refused. Now it has come to this: I am herewith discharging you effective as soon as your accrued vacation leave has been used up.
 Very truly yours,
 Andrew H. Hulsey
 Director"
Although plaintiff apparently attempted to resign from his position with the Arkansas State Game and Fish Commission rather than being fired, by no stretch of the imagination can plaintiff's departure from the Commission's employment be characterized as a "voluntary resignation". Even if semantical distinctions are recognized the word "voluntary" necessarily implies the absence of compelling or coercive considerations. Such was not the case as Mr. Hulsey's letter amply demonstrates. And even if the plaintiff was allowed to subsequently *919 resign from his position with the Commission it can hardly be said that such a resignation was a volitional act.
Another illustration of plaintiff's lack of credibility stems from the testimony of Dr. Emmett Smith, a college chancellor and a charter member of the Board of Directors for the East Arkansas Planning and Development District. The plaintiff told Dr. Smith that he had a list of things dealing with the administrative operations of the District which needed to be corrected. The plaintiff's list of items criticized Ms. Harrelson, the Executive Director of the District, Mr. Spellic, the Director of Planning, and Ms. Pippin, the Director of Finance and Administration, as being inefficient. Dr. Smith also testified that the plaintiff had alleged that there were gross abuses in the expenditure of District funds and that the plaintiff had accused administrative officers of the District of misappropriating funds. As a result of the serious allegations made by the plaintiff a general audit of District funds was conducted. The audit revealed no discrepancy or impropriety in the use of District monies. It should also be noted that the plaintiff testified at trial that he had a low opinion of Ms. Harrelson, Mr. Spellic and Ms. Pippin.
14. The court finds that William J. Gilbreath's employment with East Arkansas Planning and Development District was terminated for a number of reasons, that the termination of plaintiff's employment with the District was not the result of any single incident or deficiency and that all of the causes which led to the termination of the plaintiff's employment with the District were directly related to the plaintiff's job performance. The court further finds that the plaintiff's termination ultimately occurred as a result of the following cumulative deficiencies in the performance of his professional responsibilities:
A. Insubordination: The evidence establishes that the plaintiff failed to follow District operating policies and procedures with respect to work reports, travel and expense vouchers and office absences. Ms. Pippin, the District's Director of Finance and Administration, testified that the plaintiff was frequently requested to comply with District procedures with regard to claims for expenses and travel. On one occasion the plaintiff refused to turn a travel voucher over to Mr. Spellic, the District's Director of Planning, after Mr. Spellic had specifically requested the voucher.
The plaintiff also had to be prodded into submitting required work and activity reports. In addition to these deficiencies, the plaintiff was warned that he must account for his absences from the office. Mr. Spellic had admonished the plaintiff to establish daily priorities so that his assigned duties would be completed. He suggested that the plaintiff be more selective in the conferences and seminars he attended in order to insure that his office work was completed within designated time frames. Early in May of 1975, the same month plaintiff's employment with the District was terminated, the plaintiff was absent from his office for an entire day. While the plaintiff was allegedly attending a meeting of the District's Board of Directors, he had neither sought the approval or told his superiors of his attendance until after the fact. Nothing in the evidence suggests that the plaintiff's presence at this meeting was required or requested by the Board of Directors.
B. Lack of Cooperation: In addition to the matters set out above, the evidence establishes that plaintiff was uncooperative. Testimony produced at trial showed that the plaintiff did not bear his share of the responsibility with respect to grant renewal applications. Even though a substantial portion of the review had to be completed after normal office hours, most of the work was done by persons other than the plaintiff. The grant renewal work and the project review task were important to the *920 District's function. These responsibilities, which were clearly the plaintiff's insofar as health programs were concerned, were necessary to justify the continued funding and operation of the health services planning activities undertaken by the District. The plaintiff's lack of cooperation not only resulted in others having to assume his responsibilities but it caused the District financial loss as well. The minutes of the Board of Directors for East Arkansas Planning and Development District for November 12, 1973 reflect the following:
"* * * Mrs. Harrelson remarked that, in her opinion, the duties of the Health Planning staff have not been completed properly. When asked for specifics, Mrs. Harrelson stated that, according to a recent telephone conversation with Mr. Jess Wilson with the State Alcohol Abuse office, Mr. Gilbreath was completely unreliable and uncooperative in the recent setting of priorities for the Alcohol Abuse program and that the job done by the Health Planning staff in that connection was a very poor one. Mrs. Harrelson went on to say that, due to Mr. Gilbreath's negligence in [not] reporting to her or other members of the administrative staff the availability of funds for planning in connection with this program, the District did not apply for said funds, thus a loss to the District and its twelve-county area of $27,500 for planning this year."
Although the events referred to in the Board's minutes occurred nearly two years prior to the plaintiff's discharge, the events are relevant to the defendants' contention, and this court's finding, that there were cumulative reasons for plaintiff's termination. The District lost $27,500 in revenue in 1973 largely because of the plaintiff's lack of cooperation and lack of communication with his superiors. While this loss may not have been a substantial percentage of the District's total funds, it was nearly twice the amount of the plaintiff's annual salary from the District.
Other evidence suggests plaintiff's lack of cooperation in the performance of his responsibilities at East Arkansas Planning and Development District. The Governor of the State of Arkansas requested, after the passage of the National Health Planning and Resources Development Act of 1974, that the District make a recommendation as to the appropriate number of health planning areas which should be designated. Plaintiff Gilbreath was to prepare a proposal to be submitted at a meeting with a liaison from the Governor's Office. Ms. Harrelson, the Executive Director of East Arkansas Planning and Development, asked the plaintiff to meet with her at Little Rock the night before the meeting with the Governor's liaison for the purpose of going over plaintiff Gilbreath's proposal. The plaintiff did not meet with Ms. Harrelson as he had been requested nor did he furnish Ms. Harrelson with a copy of his proposal prior to the meeting with the Governor's aide. The plaintiff appeared at the meeting, however, and read a proposal which had been handwritten. Ms. Harrelson testified that she was upset over the incident because: (1) the plaintiff refused to meet with her prior to the presentation of his proposal although he had been specifically requested to do so; (2) the plaintiff did not furnish her with a copy of his proposal prior to his reading of the proposal at the meeting; and (3) the plaintiff had not prepared the proposal in a manner suitable for presentation to the Governor's liaison. It was obvious from Ms. Harrelson's testimony that she was embarrassed by the plaintiff's handling of the matter.

*921 C. Unprofessional Conduct: Ms. Pippin, the Director of Finance and Administration for East Arkansas Planning and Development District, testified that she also filled the capacity of a general office manager at the District's headquarters. Ms. Pippin testified that some of the District's secretaries had complained about sexual advances from the plaintiff. Ms. Pippin testified that some of the female office workers had complained to her with regard to the plaintiff's actions in pulling out their blouses, pinching and petting them. Ms. Pippin testified that the plaintiff has used vulgarities and obscene language in the presence of female office workers. Ms. Pippin further testified that the plaintiff's conduct was such that some of the female employees refused to work with him or for him. At least one young female employee, according to Ms. Pippin's testimony, left her employment with the District rather than work for the plaintiff. It should be noted that while the plaintiff had ample opportunity to do so, he never denied that he had engaged in the conduct revealed by Ms. Pippin's testimony.
15. The court finds that the plaintiff's employment with East Arkansas Planning and Development District was terminated for legitimate and substantial job related reasons. Correspondingly, the court finds that the plaintiff's claim that he was discharged for the exercise of his constitutional rights to be without support in the evidence produced at trial and, hence, without substance or merit. Most of the plaintiff's occupational inadequacies apparently stem from a demonstrated inability or refusal to accept any authority other than his own. In any event, the evidence clearly establishes that the plaintiff failed to conform to the District's operating policies and procedures and that the plaintiff failed to perform his assigned responsibilities in an acceptable manner on several occasions.
16. The court finds that the plaintiff has failed to sustain his burden of proving that his termination was motivated by constitutionally impermissible considerations, i. e., the exercise of his First Amendment freedom of speech or any other constitutional right.

II.

CONCLUSIONS OF LAW
1. 42 U.S.C. § 1983 provides as follows: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."
2. A person seeking to establish a claim for relief under 42 U.S.C. § 1983 must establish two essential elements: (1) the deprivation of a right secured by the Constitution and laws of the United States; and (2) that the person or persons who caused the alleged deprivation were "acting under color of state law."
3. The requirement of 42 U.S.C. § 1983 that challenged actions be under color of state law is treated as equivalent to the state action requirement of the Fourteenth Amendment's Equal Protection Clause. Parks v. "Mr. Ford", 556 F.2d 132 (3rd Cir. 1977); Green v. Dumke, 480 F.2d 624 (9th Cir. 1973); Smith v. Bekins Moving & Storage Co., 384 F.Supp. 1261 (E.D.Penn. 1974).
4. The issue of whether there has been sufficient "state action" to confer jurisdiction under the provisions of 42 U.S.C. § 1983 must be resolved on a case by case basis, especially where the constitutional validity of the actions of an entity, seemingly private, are challenged. See Gabaldon v. United Farm Workers Organizing Committee, 35 Cal.App.3d 757, 111 Cal.Rptr. 203 (1973), cert. denied, 416 U.S. 957, 94 S.Ct. 1972, 40 L.Ed.2d 307 (1974).
*922 5. While the standard for determining when private conduct becomes "state action" has been elusive, generally, a claimant satisfies the state action prerequisite by establishing that a symbiotic relationship existed between the state and the private entity allegedly engaging in the discriminatory conduct. Alternatively stated, if the evidence establishes that the state is significantly involved in the activities of a private entity engaging in discriminatory activity, the conduct of the private entity falls within the purview of 42 U.S.C. § 1983. See, Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961); Weigand v. Afton View Apartments, 473 F.2d 545 (8th Cir. 1973).
6. The court considers the totality of the circumstances presented by the evidence in determining whether state action is present in a particular case. Barrett v. United Hospital, 376 F.Supp. 791 (S.D.N.Y. 1974).
7. While some courts have held that mere governmental financial involvement in a public function or in businesses which affect the public interest is insufficient to predicate a finding of state action under 42 U.S.C. § 1983, Trivits v. Wilmington Institute, 417 F.Supp. 160 (D.C.Del.1976), other courts have found state financial support to be a relevant consideration in determining whether state action is present. Buckton v. National Collegiate Athletic Association, 366 F.Supp. 1152 (D.Mass.1973).
8. Where, as in the present case, a nonprofit corporation has been created by virtue of state law, the state government has provided significant financial support for the activities of the corporation, the state has delegated functions relating to the planning and delivery of public services to the corporation, the corporation has engaged in activities normally performed by governmental agencies, the corporation has worked in cooperation with various agencies or instrumentalities of state government and the supervision of the affairs of the corporation has been vested in a board of directors, the majority of which are local elected officials, the conduct of the "private" nonprofit corporation has become so entwined with governmental policies and so impregnated with a governmental character as to subject the conduct of the corporation to the institutional limitations placed upon state action. See, Buckton v. National Collegiate Athletic Association, supra.
9. There is a sufficient nexus between the activities of East Arkansas Planning and Development District and state and local governments to bring the alleged discriminatory practices of the District within scrutiny under the provisions of 42 U.S.C. § 1983.
10. Due process considerations are not implicated in decisions to terminate employment unless termination adversely affects protected "property" or "liberty" interests. Bishop v. Wood, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976).
11. The Due Process Clause of the Fourteenth Amendment does not require that an employee be given a statement of the reason or reasons for the termination of his employment or a pretermination hearing unless the employee establishes a "protected property" interest in his employment. In the present case, the plaintiff has the burden of establishing that his employment with East Arkansas Planning and Development District was a "protected property" interest within the meaning of the Fourteenth Amendment to the United States Constitution. Board of Regents v. Roth, 408 U.S. 564, 569, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).
12. "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is the purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is the purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims." 408 U.S. at 577, 92 S.Ct. at 2709.
*923 13. Property interests are not created by the Constitution. They are created and defined by existing rules and understandings "that stem from an independent source such as state lawrules or understandings that secure certain benefits and that support claims of entitlement to those benefits." Id. at 577, 92 S.Ct. at 2709, see also Bishop v. Wood, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976).
14. One method of determining whether the plaintiff had a "protected property" interest in continued employment with the East Arkansas Planning and Development District is by referring to applicable state law. Bishop v. Wood, supra.
15. Since the plaintiff had no contract of employment with the District which specified or delineated the duration of his employment, the employment relationship was terminable at the will of either party under Arkansas law. See, e. g., Miller v. Mo-Pac Transportation Co., 225 Ark. 475, 283 S.W.2d 158 (1955) (contracts of employment may be terminated at the will of either party where the contract, expressed or implied, designates no definite term of duration); Clark v. Mann, 562 F.2d 1104 (8th Cir. 1977) (Arkansas' "continuing contract" system does not give rise to an expectation of continued reemployment which entitles the teacher to a property interest in that employment); Cato v. Collins, 539 F.2d 656 (8th Cir. 1976).
16. The absence of a contract or understanding as to the duration of plaintiff's employment with the District does not, however, erect an insurmountable barrier to the plaintiff's ability to establish a property interest in his employment. The plaintiff may also establish a legitimate claim of entitlement to continued employment by an implied contract, by statute or ordinance, or by applicable personnel regulations if they reflect a de facto policy of establishing guidelines to be followed prior to dismissal. Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); Board of Regents v. Roth, supra; Bishop v. Woods, supra; Mazaleski v. Truesdell, 183 U.S.App.D.C. 182, n. 38, 562 F.2d 701, n. 38 (1977), rehearing denied, citing Vitarelli v. Seaton, 359 U.S. 535, 539, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959); Gerrin v. Hickey, 464 F.Supp. 276 (E.D.Ark.1979).
17. The plaintiff has failed to establish that he had a "protected property" interest in continued employment with the East Arkansas Planning and Development District. Accordingly, the District was not constitutionally obligated to provide the plaintiff with a statement of reasons for his termination or a pretermination hearing.
18. The fact that the plaintiff does not have a "protected property" interest in his employment with the District does not defeat his claim that his termination was premised on the exercise of his First Amendment rights. Perry v. Sindermann, supra.
19. Even though a person may not have a "right" to a valuable benefit, once the benefit has been conferred it may not be denied or taken away for a constitutionally impermissible reason.
20. A person cannot be denied employment because of the legitimate exercise of First Amendment rights, particularly a person's interest in freedom of speech. The denial of employment because of constitutionally protected speech in effect penalizes and inhibits free speech and thereby permits the employer to achieve by indirection that which the employer could not command directly. Speiser v. Randall, 357 U.S. 513, 526, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958); see also, Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); Keyishian v. Board of Regents, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967).
21. Where there is a possibility that an employee was terminated for constitutionally impermissible reasons, the court must necessarily assess the alleged "mixed motives" of the employer and determine whether the termination of employment was premised on rational and legitimate job-related considerations, constitutionally permissible reasons for discharge, or on the exercise of constitutionally protected *924 rights, constitutionally impermissible reasons for discharge. Mabey v. Reagan, 537 F.2d 1036, 1044-1045 (9th Cir. 1976).
22. The plaintiff has failed to establish that his employment with East Arkansas Planning and Development District was terminated in retaliation for his exercise of his First Amendment rights. The overwhelming weight of the evidence clearly establishes that the plaintiff's termination was predicated on a number of compelling job-related considerations.